(No. 15139.—Decree affirmed.)
WALTER GUY SLATER et al. Appellees, vs. MARY E. SLATER,
Appellant.

*Opinion filed December 19, 1923—Petition stricken Feb. 6, 1924.*

1. HUSBAND AND WIFE—*general rule as to when a presumption arises against validity of ante-nuptial contract.* Parties to an ante-nuptial contract occupy a confidential relation toward each other, and where such contract contains no provision for the intended wife, or if the provision is disproportionate to the property of the intended husband, a presumption exists that the execution of the instrument was procured by designed concealment of the amount of the husband's property, and those claiming against the wife have the burden of showing that when she executed the contract she had full knowledge of the value of her intended husband's property or that the circumstances were such that she reasonably ought to have had such knowledge.

2. SAME—*when an ante-nuptial contract is valid, regardless of whether deed was part consideration.* Whether a deed executed by an intended husband to his future wife three years prior to the execution of an ante-nuptial contract was a part of the consideration for such contract or was intended as a gift is of no consequence, and the wife is bound by the contract where the record shows clearly that she entered into it with full knowledge of the extent and value of her intended husband's property and that he made no attempt at concealment and practiced no fraud upon her, thereby overcoming any presumption against the contract arising from the fact that it makes little or no provision for the wife.

FARMER, C. J., CARTWRIGHT and DUNCAN, JJ., dissenting.

APPEAL from the Circuit Court of Livingston county; the Hon. FRANK LINDLEY, Judge, presiding.

C. F. H. CARRITHERS, and ADSIT, THOMPSON & HERR, for appellant.

LIVINGSTON & WHITMORE, and E. A. SIMMONS, guardian *ad litem,* (STELLA E. WHITMORE, of counsel,) for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellees filed a bill in the circuit court of Livingston county seeking to partition certain real estate owned by Chester G. Slater in his lifetime and to free the same from any claim of dower by his widow, Mary E. Slater, appellant. The bill sets out an ante-nuptial contract between Slater and appellant, then Mary E. Gregg, dated August 21, 1918, by which appellant, for the consideration therein named, agreed to waive and release all interest which she might have in the property of Slater. The bill alleges that the contract was entered into with full understanding on the part of the widow. She answered the bill, denying all its material allegations and alleging that the contract was without consideration and void and that she was not fully informed as to Slater's property at the time she executed the contract. The chancellor sustained the ante-nuptial contract, dismissed the cross-bill of appellant and decreed partition among the heirs of Slater, as prayed in their bill, free from dower right in appellant.

The question involved in this case is whether or not this contract barred the appellant's right of dower in the lands of Slater. They were married on August 26, 1918. At that time Slater was sixty-nine years old and appellant was fifty-one. He died on April 24, 1920. At the time of his death he was seized of 320 acres of land in Livingston and McLean counties, some lands in Indiana and Louisiana, town lots in Livingston and McLean counties, besides several thousand dollars in personal estate. He executed a will on December 16, 1915, which was presented for probate, but probate was denied because it was held by the probate court to have been revoked by his subsequent marriage to appellant. No appeal from this holding appears to have been taken but his heirs later filed the bill for partition under consideration here. On reference to the master the

latter found that the contract was void for want of valid consideration and that it was a fraud on appellant's marital rights, and recommended that she be decreed to be entitled to dower in the land. The chancellor, however, sustained exceptions to the master's findings, and held that appellant had full knowledge and information as to the amount and value of Slater's property and that there was no fraud or concealment practiced on her by Slater or by anyone acting for him.

Slater was a farmer, living about two miles from the village of Fairbury. Appellant lived in Fairbury and for a number of years prior to their marriage she and Slater were intimately acquainted. The record shows that in December, 1915, he deeded her two pieces of real estate in Fairbury, and that the contract in question was executed on August 21, 1918, just prior to their marriage. Appellees contend that the deed to these two properties was the consideration for her signing the ante-nuptial contract. Appellant says that this deed was a gift, pure and simple, and bore no relation whatever to the contract, though the contract recites that such deed is the consideration therefor. During the time in which Slater and appellant were acquainted, and during their marriage, Slater's real estate consisted of the same items, which fluctuated in value as other items of real estate did during those years. Appellant had been the wife of Peter Gregg, a teamster living in Fairbury, and neither she nor her husband owned any property. She contributed to the maintenance of the household by doing laundry work for others. Slater's wife died in 1911. In 1912 Slater purchased the property in which the Greggs lived and the lot adjoining it, on each of which was a four-room house. Appellant was divorced from her husband in 1914 on the ground of habitual drunkenness.

The evidence of appellees consists of the testimony of E. A. Agard, an attorney at law of Fairbury, who drew Slater's will and the ante-nuptial contract in question, and

numerous letters by Slater to the appellant. Except as to matters of formal proof Agard was the only witness of appellees in their case in chief. He testified that he was Slater's attorney in his lifetime; that he had known him for a number of years; that he had taken the acknowledgment to the deed executed in December, 1915; that he had called the appellant to his office on December 9, 1915, prior to the making of the deed, and told her that Slater had called him to his house and told him that he wanted to make a will; that he had prepared a deed conveying the Fairbury property to the appellant; that he and the appellant were to be married as soon as his health permitted; that appellant had agreed to enter into an ante-nuptial contract releasing all rights she might acquire in his property by virtue of the marriage and in consideration thereof. He testified that Slater directed him to deliver the deed to appellant but to keep it from record until some future time; that Slater asked the witness to see appellant and see if that was her understanding concerning their marriage. Agard also testified that when he called appellant to his office he asked her if it was her understanding that she was to receive none of Slater's property, and that she stated that it was; that he asked her if she realized that she was giving up a good deal; that Slater owned four eighties of land in Livingston county, an acre in Cropsey, three-fifths of 150 acres in Indiana, three-fifths of the same amount of land in Mississippi or Louisiana, and from $5000 to $20,000 worth of personal property, and that witness gave her the approximate values of the property. He also stated that appellant told him that she understood that but that she was not marrying Slater for his money. Witness stated that he then delivered the deed to her and had her acceptance thereof witnessed, and that she gave it back to him in accordance with Slater's request that it be put in witness' custody and not recorded until later, and that in case Slater died appellant was to go to Agard and get the deed and have it re-

corded. The witness also testified that he drew the ante-nuptial agreement and the will; that he had the ante-nuptial contract at the time the deed was executed and had delivered it to Slater at that time.

The original contract has been certified to this court for inspection. It appears to have been just as originally written, except that the date has been erased and the date of actual execution, August 21, 1918, has been inserted. Appellant claims that the statement of Agard that he had drawn the contract at the time the deed was delivered, in December, 1915, could not be true, because a close examination of the original contract shows it had been previously dated in October, 1916, nearly a year after the date of the deed.

Appellant testified that she went to Agard's office in December, 1915; that he told her that Slater was very ill and had asked him to prepare his will; that Slater had made a deed to her of the Fairbury lots and that Agard asked her if she would accept the deed. She testified that she said she would and that Agard called two witnesses and delivered the deed to her. She stated that Agard did not say at that time that Slater told him that they had agreed to enter into an ante-nuptial contract or that the deed was to be the consideration for that contract; that nothing was said about that matter. She testified, also, that Agard said nothing about the property that Slater owned, but that she knew Slater intended to divide his property among his children.

Mary Romig, a witness for appellant, testified that she was staying at appellant's house when the latter and Slater were married; that Slater said he was taking appellant away a poor widow but would bring her back a rich woman; that Slater told her that appellant did not realize how much he was worth.

In rebuttal Agard testified that he had discussed Slater's property and the ante-nuptial agreement with appel-

lant at least three times; that the first time was when the deed was delivered; that the second time was in his office four to six months later, when appellant and Slater were present; that at that time Slater had the ante-nuptial contract with him and said that they had come to have the witness tell appellant what the effect of the ante-nuptial contract would be if she signed it; that he told her then what Slater's property consisted of and asked Slater if it was correct and that the latter said it was; that appellant then said it made no difference what property he had,—she was not marrying him for his property. Agard also testified that the third time the agreement was discussed was immediately prior to their marriage, when the same was executed; that appellant was then told that she would sign away all rights to Slater's property and that he was counted a wealthy man, but that she stated she was not marrying him to get his money; that he had given her a home and that was all she wanted; that at that time the contract was signed, and the witness acknowledged the same and put it in an envelope and gave it to Slater. He also testified that Slater then asked him if the signing of the contract would prevent his (Slater's) giving appellant anything he wanted to, and that the witness told him it would not.

Appellant in sur-rebuttal produced a letter written by Slater from Logansport, Indiana, dated December 29, 1916, in which he stated that he would do all he had promised her; that the contract would be ready to sign when he got back. She also testified that about a week after receiving this letter she and Slater went to Agard's office and there they talked about Slater's property and the contract. She also testified that Slater gave the contract to Agard, and Agard asked if he had told her what property he owned, and Slater said that he had; that when they told Agard that they were not ready to be married at that time, he advised them not to sign the contract but to wait until they

were ready to marry and come up with the contract. She testified that at that time Agard said something to her about the property which Slater owned but not its value; that at that time Slater told her she would not regret signing the contract as he would make provision for her in his lifetime. It is seen, therefore, that the testimony of appellant and the witness Agard is in conflict as to the time of making the ante-nuptial agreement and as to her understanding concerning the amount of Slater's property.

Slater wrote numerous letters to the appellant, many of which were introduced in evidence. In all of these Slater made strong protestations of love and spoke of their marriage and numerous other matters. On November 15, 1915, he wrote: "I have every confidence in you, dear. I want to get things arranged for you as we have always talked. I want you to have the little place on the corner." On December 3, 1915, he wrote concerning his health, and further as follows: "I am going to arrange my will. I want each one to have a share of my property, you included. I am going to give each of the children 80 acres, designating the places to each one. At the same time I do not relinquish the control of it. While I live they will have to pay me rent. It is theirs at my death—not before. I made a deed to you for both places where you live, last Monday. It is deeded the same way. It will be under my control while I live but will be yours absolutely at my death. In disposing of it I mean to the children in retaining possession while I have it will give me just as much income as now. I have considerable other property,—some in partnership with Tom. I shall not dispose of it now only as to how it shall go if I should be called suddenly. So you will see I am not going to put myself at the mercy of any of my children. They will be sure of their inheritance and I of my living, for they will kick over the traces when I make you my wife, but you will be provided for so we can enjoy ourselves together comfortably without going out to

wash by the day, if you prove out to be the wife I trust you
will be to me." On December 9, 1915, he wrote that Agard
came on the 8th and made a memorandum of his will and
took the same to his office; that Agard took the deed which
he (Slater) had made for appellant and would call on her
and have her accept it and give custody of the deed to
Agard until such time as it can be recorded; that he did
not want the deed recorded at that time because of inquisi-
tive gossips; that in case he should die appellant was to
go to Agard and get the deed. He also writes concerning
the division of his property among his children: "I did
not give each one deeds as I thought I would, as Agard
advised me not to do it. I made a will designating each
piece of land I wanted each one to have and all the way
through with my other property. * * * I wrote Tom a
ten-page letter, sent it to him, telling him just what dispo-
sition I made of everything. I told him I had given you
a deed to these two little places and if God saw fit to spare
my life I would marry you, in all probability, and if I did
I wanted to be friendly with all the children, as my marry-
ing you would not deprive them of their inheritance. The
rents from the land would more than keep me, and I could
save up from this source so I could leave something for
my wife if she outlived me." On December 15, 1915, he
wrote appellant: "I want to get done with the will so
if anything should happen sudden I will have things as I
want them. You don't know, Mary, how much better I
feel to know you are provided for if I should be called
sudden. You will have a home and you will always keep
it clear of debt and in your own name." On February 18,
1916: "The way I am planning is to give you a good visit
then to come back here to look after things, and if my
strength will permit will come often to see you until we
get this crop raised. If you are willing to some arrange-
ment like this, will get a marriage cont. made between us
so the children can't say you want me just to get my prop-

erty. After this contract is made we can marry when we please. You will understand what a marriage contract means. It is simply this: whatever I and you agree to give you will be all you can get, as you sign away your right to my property as my wife. It wont be a very bad one on you, as I want to fix things so out of the income from the property we can save up so you will have something to go on after I am gone, and this amount will depend how saving and considerate you will be in the matter." On March 11, 1916: "I don't think Mrs. Hines has any designs on me. She draws a pension of $12 a month and has for the last twenty-seven years. I told her in our talk you were not wanting to marry me for money as I had made my will and you had always told me you did not want to come in to take their inheritance, and before we are married I should make a marriage contract with you so you cannot take any share of my property other than that named in the marriage contract. She said this ought to satisfy them of your love for me being honorable and not of a mercenary character." On May 14, 1916: "I wish we had married as soon as the law would have permitted us to do so. I believe in your sincerity of being willing to sign the contract, and you will never regret it. I told Tom all about our engagement and of what you said in regard to signing the contract. You will not be a portionless bride by any means, as I shall arrange so we can save up from my income so we can have something for you after I am gone. I love you too well to be stingy with you, but we will be comfortable and saving as we can so as to have some money left to you. * * * I have written Agard a letter to-day about making out the marriage contract when I am well enough to come." In his letter to her of September 29, 1916, he says: "When I get back to you the contract will be ready to sign as we have talked, provided you love me and want me I will do all I promised you."

Where one spouse by an ante-nuptial contract agrees to accept in lieu of dower the provision made in the contract such contract is binding, but where a wife has entered into such contract and no provision is made in it for her, or if the provision made is disproportionate to the property of the intended husband, a presumption exists that the execution of the instrument was procured by designed concealment on the part of the husband of the amount of his property, and those who claim against her have the burden of showing that at the time she executed the instrument she had full knowledge of the nature, character and value of her intended husband's property or that the circumstances were such that she reasonably ought to have had such knowledge. (*Dickason* v. *English,* 272 Ill. 368; *Colbert* v. *Rings,* 231 id. 404; *Murdock* v. *Murdock,* 219 id. 123; *Kroell* v. *Kroell,* 219 id. 105; *Dunlop* v. *Lamb,* 182 id. 319; *McGee* v. *McGee,* 91 id. 548.) Parties to an ante-nuptial contract occupy a confidential relation toward each other. *Taylor* v. *Taylor,* 144 Ill. 436; *Pierce* v. *Pierce,* 71 N. Y. 154; *Kline's Estate,* 64 Pa. St. 124; *Hessick* v. *Hessick,* 169 Ill. 486; *Achilles* v. *Achilles,* 151 id. 136; *Graham* v. *Graham,* 143 N. Y. 573.

Much argument is devoted to the controversy as to whether or not the deed given by Slater to appellant in December, 1915, was a gift or was intended as a consideration for the ante-nuptial contract executed nearly three years thereafter. Whether the deed was a gift by reason of the relations existing between them or a part consideration for the contract is of no consequence, if, as a matter of fact, appellant, at the time she entered into the contract with Slater, knew and understood the extent and value of Slater's property and with that understanding signed the contract.

While the testimony of appellant and the witness Agard as to her knowledge concerning the extent of Slater's property is in conflict, much information on her part concerning

that matter is shown throughout the record. In the first place, as we have seen, appellant testifies that on one occasion prior to the execution of the contract in Agard's office Agard told her about Slater's property. She says, however, that he did not speak about amounts or personal property. In Slater's letters to her, however, constant reference was made to the fact that he desired that his property be given to his children; that he proposed to retain a life interest in it, and that when they married they would be able to accumulate from the income of it something for her after his death. This is shown by his letter of December 3, 1915, and others. His letter of December 9, 1915, tells her plainly that he had willed not only certain lands to his children, but had done the same "all the way through with my other property;" that he had written his son Tom "just what disposition I made of everything." His letter of December 3, 1915, tells her about giving his real estate to his children, and that he had "considerable other property" which he would likewise will to them. His many references in letters to appellant to his different properties, coupled with their intimate relationship and frequent discussion of the marriage contract between them, show clearly that he made no attempt at concealment concerning the extent and value of his property, and that neither he nor anyone for him practiced any fraud upon her. It is also evident from the various passages in his letters to her that she knew that the only property she was to receive from him, aside from the two pieces already deeded to her, was such as they would save from the income of his property during his lifetime. In his letter of December 9, 1915, he told her that the rents from the land would more than keep him, and that he could save from this source so that something might be left to her if she outlived him. In his letter of February 18, 1916, after reminding her of the meaning of an ante-nuptial contract, he again told her that he hoped to save something for her from the income from his property, say-

ing, "and this amount will depend how saving and considerate you will be in the matter." To the same effect is his letter of May 14, 1916.

These letters show that appellant must have understood when she entered into the contract, not only the nature of Slater's property but that she was waiving her right to any other than that which she had received or would receive as a result of their saving, and that she would receive nothing more. By his letter of December 9, 1915, he told her he had written Tom, (his son,) telling him of the disposition he had made of everything by will. She knew she was not included in that will and does not now claim otherwise. We are of opinion that the presumption concerning concealment or want of knowledge on her part is entirely overcome by the evidence in the record. There is no evidence whatever of concealment on his part. On the contrary, his letters freely discuss his property.

Appellant says she understood that the real estate, only, was to be given to the children and not the personal property; that she did not know what the personal property was, and that there was no representation to her that the personal property would go to the children. This contention is not borne out by the record. There is nowhere in the record any evidence that he ever represented to her that she would get any real estate whatever or that she would get any personal property other than what they might save out of his income. The only reference to personal property is that contained in his letters telling her that he had willed all his property, other than real estate, to his children, and his representation to her that they would endeavor to accumulate out of his income something for her. This arrangement was evidently satisfactory to her. The record is silent as to whether or not there were such accumulations during the two years in which they lived together.

So it may be said that, without regard to whether the deed to appellant was a gift or constituted an executed con-

310—30

sideration for the contract, the latter is nevertheless binding for the reason that the record overcomes any presumption of fraudulent concealment on the part of Slater as to the character, value and extent of his property. The chancellor, therefore, was right in dismissing appellant's cross-bill and decreeing partition of the land free from claim of dower by appellant.

The decree of the circuit court is therefore affirmed.

*Decree affirmed.*

FARMER, C. J., CARTWRIGHT and DUNCAN, JJ., dissenting:

We cannot agree with the decision of the court in this case. As we view it, the opinion is contrary to law, and it is certainly contrary to the principles of justice. To our minds the deed to appellant of the property of small value conveyed to her was never intended to form any part of a marriage settlement but was a gift by the grantor to her and was made more than two and a half years before the ante-nuptial agreement was executed. The evidence, as we view it, clearly shows that appellant knew she was relinquishing any right she might have as widow in her husband's property, especially the land; but it as unmistakably shows that appellant was promised that if she did sign the agreement her husband would make provision for her out of property other than the land. He was amply able to do so, as his personal estate was worth approximately $20,000, and he had the use of and income from the land. There can be no question that the evidence shows Chester G. Slater promised appellant if she would sign the agreement he would make provision for her if she survived him, and that she relied on his promise. Agard, Slater's attorney, testified that at the time the agreement was signed Slater asked him if the signing of the agreement would prevent him from giving appellant anything he wanted to, and Agard told him it would not. Slater made no provision whatever

for appellant, and when, after his death, she went to his attorney to inquire what provision had been made for her, she was nonchalantly told that none had been made and that she could return to her washtubs.

It would serve no useful purpose for us to enter into an elaborate discussion of the testimony and the authorities, but in our opinion appellant was entitled to the relief she sought.