(No. 24196.—

MABEL T. MEGGINSON, Appellee, *vs.* WILLIAM B. MEGGINSON *et al.* Appellants.

*Opinion filed October 22, 1937.*

CARL E. ROBINSON, for appellants.

WILFORD H. ABSHER, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

By this appeal the validity of an ante-nuptial contract is presented for determination.

Pertinent facts disclosed by the pleadings and evidence are as follows: Ralph W. Megginson, a widower, owned two farms consisting of one hundred acres and eighty-six acres, respectively, east of Woodson, in Morgan county. Of these, he had acquired the larger one by inheritance from his father, and the other by purchase. Megginson lived on one of the farms when he met Mabel Thies in Jacksonville in the fall of 1919. On April 17, 1920, they became engaged to marry. More than nineteen months later, namely, on December 9, 1921, they entered into an ante-nuptial agreement. Megginson, at that time, was sixty-six years of age and the father of nine children. Mabel Thies was thirty-three years of age. The agreement recited that it was made in contemplation of the impending marriage, and for the additional reason that Megginson's deceased wife and their children had assisted him in the accumulation of his estate. The contract provided that, in consideration of the proposed marriage, Megginson would concurrently execute and deliver to Mabel Thies his note for $5000, payable to her upon his death, with interest at

the rate of six per cent annually from that day until paid; that she would accept this sum, when paid, in lieu of all rights, including dower and homestead, which she might acquire through such marriage, to the property owned by Megginson; that any child or children born to the parties during the marriage would share equally in Megginson's estate with the children by his first marriage, and that no gift which he might make to his future wife should be deemed either partial or full payment of the sum attempted to be settled upon her. The concluding paragraph declares that Mabel Thies entered voluntarily into the agreement; that she had not been induced to agree to marry Megginson from mercenary motives, and, further, had not been misled as to the value of his property, "well knowing that he could make a settlement upon her many times larger than said sum of five thousand ($5000) dollars, if he deemed it equitable so to do." The contract was executed in duplicate under the hands and seals of the parties and its execution was acknowledged by each of them.

The parties to the agreement were married eleven days later, on December 20, 1921, and lived together as husband and wife thereafter. Two months after the marriage, Megginson purchased, from his wife's father, a residence in Jacksonville, costing between $4000 and $4500. Megginson and his wife occupied this property as a homestead. A daughter, Mary Elizabeth, born to the couple on May 7, 1924, lived with her parents in the homestead property. Mabel Megginson was adjudged incompetent on December 12, 1933, and on January 3, 1934, her husband was appointed her conservator. Megginson died on July 20, 1934, while his wife was still incompetent. She was restored to her property rights on November 8, 1934, and on November 27 her books and papers were turned over to her. Among them were a duplicate original of the ante-nuptial contract and the note, both of which were found in her husband's safety deposit box.

Megginson's will executed on January 24, 1930, and two codicils added on October 13, 1932, and October 23, 1933, were admitted to record in the county court of Morgan county. The testator devised his homestead property to Mabel Megginson during her widowhood, with the remainder to his ten children upon her death or re-marriage. He also bequeathed to his wife all of his household goods and furniture. By the fourth section he bequeathed to her $5000, with interest at the rate of six per cent per annum, payable annually from the date of his death. This section recited that the bequest was made conformably to the marriage contract and that the testator especially desired, and accordingly directed, payment of the bequest and interest thereon as promptly after his death as practicable. It was provided by the fifth section of the will that the residue of the personal property should be distributed in equal shares among testator's ten children, excepting that the share of his minor daughter by his second marriage be held in trust by his wife, as trustee. By the sixth section the executors, William B. and George T. Megginson, two of testator's sons, were appointed to manage his farms and to divide the net annual income therefrom among his ten children for ten years after his death, unless prior thereto the land should attain the value of $200 per acre, when it should be sold. The same section further provided that the homestead property should not be sold so long as Mabel Megginson remained his widow. Like provision for distribution of the proceeds from the sale of the land was made as for the division of the residue of his personal property. The first codicil declared that Joseph Megginson, one of testator's sons, had received advances aggregating more than his proportionate share of the estate, and directed that he should not participate in its distribution. The second codicil recited that the burden of acting as trustee for their daughter would likely impair his wife's health, revoked her appointment as trustee and

appointed his executors as trustees for the minor's share. On December 1, 1934, Mabel Megginson transmitted to the county court and filed in the office of the clerk her written renunciation of the provisions made for her in her husband's will, asserting that she elected to take her statutory share of his estate. She received a widow's award of $800 and an additional $200 for the support of her minor child.

On September 19, 1935, the plaintiff, Mabel T. Megginson, filed a complaint in the circuit court of Morgan county alleging that owing to the birth of her daughter, a member of the household residing with her parents, prior to and at the time of Megginson's death, and her (plaintiff's) renunciation of the will, the ante-nuptial contract became void. The relief sought was the cancellation of the agreement and partition of the three parcels of real estate owned by Megginson. The heirs-at-law of the testator, with the exception of the disinherited son, and, in addition, assignees of certain heirs, were made parties defendant. On December 5, 1935, pursuant to leave granted, plaintiff filed an amended complaint. The allegations are, in substance, those in the original pleading, with the exception that they omit mention of the ante-nuptial contract and the note executed contemporaneously therewith. The defendants, other than the guardian *ad litem* and the assignees, answered that plaintiff's only interest in the real estate was a homestead interest in the residence property. Their answer set forth the ante-nuptial contract, averred that it was in full force and effect, and, hence, binding upon plaintiff; that, in particular, it barred her dower interest in Megginson's property, and that the contract was partly executed prior to Megginson's death. Defendants also averred that the note for $5000 was delivered to plaintiff, and that the executors had offered to pay and had tendered to her the amount due on the note, regardless of whether she was entitled to a homestead interest in the residence property. In her

replication plaintiff admitted the execution of the agreement, but alleged that at the time of its execution and during the period she and Megginson were engaged to marry, he owned the two farms and personal property having an aggregate value of $65,000; that the provision for her in the contract was disproportionate to the value of his property, and that the contract was therefore fraudulent as to her marital rights and not binding upon her. She denied that the note was delivered to her, that dower in the farms was barred by the contract, and that it was partially executed prior to her husband's decease. By their rejoinder defendants denied the new allegations and averred, on the contrary, that the contract was fairly and knowingly entered into between the parties with a complete understanding and appreciation, not only of its terms, but of the nature and extent of Megginson's property. Plaintiff's final pleading denied that the contract was fairly and knowingly entered into.

The cause was referred to the master in chancery. Before he heard the testimony, the executors tendered to plaintiff the sum of $5000 in payment of the principal of the note previously mentioned, and an additional $500 interest thereon, from the date of Megginson's death. The tender was refused. After a hearing the master decided the issues against plaintiff and recommended that a decree be entered dismissing the amended complaint for the want of equity. Objections filed to the master's report were overruled and ordered to stand as exceptions. The chancellor, without hearing additional evidence, sustained the exceptions and on February 19, 1937, entered a decree finding that plaintiff was entitled to a homestead interest and an undivided one-third part in fee of the homestead property and in each of the two farms, and that the trustees under Megginson's will owned an undivided two-thirds part in fee in the farms and the homestead property, subject to plaintiff's homestead interest in the latter. The ante-

nuptial contract and the note were directed to be cancelled and partition of the farms ordered. The trustees, and three of the five adult children who had not assigned their interest in their father's estate, prosecute this appeal.

Additional facts and circumstances appear from the record. On the day the ante-nuptial contract was signed, the attorney who prepared the agreement read it aloud and both parties affirmed that it included the desired provisions. The attorney testified that he gave to each party a duplicate original of the contract. According to plaintiff, testifying as a witness for the guardian *ad litem,* neither the attorney nor Megginson advised her of the amount of property, personal or real, owned by the latter. In particular, she testified that he told her they would be compelled to live on the income from the farms and if it became necessary to borrow money on the land it might be all he would have left. Plaintiff added that Megginson, on December 9, 1921, in referring to the note in the contract, a copy of which was in front of her, said: "Here, Mabel, I am giving you $5000." From her testimony it appears that Megginson placed both copies of the contract and also the note in his safety deposit box at a bank, and that she did not object. On cross-examination, plaintiff admitted that Megginson informed her he owned two farms and also that she knew he had acquired one of them by descent. She stated, however, that she made no inquiry of Megginson or any other farmer as to the nature and extent of his property. Furthermore, the witness continued, she knew the contract was for $5000, was satisfied "in a way," and protested to no one. Plaintiff testified, further, that during her husband's life she considered the ante-nuptial contract binding upon her, wrote letters to that effect in which she declared, particularly, that the agreement, itself, was proof of the fact she had not married her husband for his money, and that, during all this time, she had expected to abide by the contract. She said that she renounced the will because

Megginson had changed it, meaning, according to her counsel, her removal as trustee of her daughter's share of his estate.

The witnesses Pearl Kessinger and Letha Stalcup testified to statements purporting to have been made by Megginson in their presence in 1931. Mrs. Kessinger's testimony disclosed she first became acquainted with plaintiff and her husband in that year. Later, she was employed by them. From her testimony it appears that in June, 1931, following a domestic quarrel with his wife, Megginson informed the witness that he had plaintiff "tied," explaining, "Well, I made her sign a contract a year or more before we were married." The record contains no other evidence that plaintiff signed any contract with Megginson a year or more before their marriage. According to the witness, Megginson continued, "I told her I was worth between $15,000 and $20,000. I did not tell her how much property I had. I did not tell her I was worth $65,000 because I did not think it was any of her business." The witness related a second conversation with Megginson to the same effect, also in June, 1931. According to Mrs. Stalcup's testimony she had been acquainted with Megginson and his wife for about four or five years prior to his death. To her friend's testimony she added that Megginson informed them he had a farm worth $65,000 and personal property valued at $15,000 or $20,000 when the marriage contract was signed. There is no other testimony concerning the amount of personal property, if any, owned by Megginson. Both witnesses admitted that, prior to the conversations related, Megginson had not discussed his business affairs with them.

The master, who heard considerable evidence with respect to the value of the farms, found that the value of Megginson's property on December 9, 1921, was $60,000, the real estate being worth approximately $50,000 and his personal property, $10,000. The chancellor found that the property at that time was worth $75,000, but did not allo-

cate values. Defendants, by failing to argue their assignment of error in this regard, waived it.

One of the principal contentions which requires consideration in determining the propriety of the decree assailed is, whether the agreement was fraudulent as to plaintiff's marital rights. It is settled that persons competent to contract may execute a valid ante-nuptial agreement. (*Seuss* v. *Schukat*, 358 Ill. 27.) Marriage is sufficient consideration for such contracts. (*Morris* v. *Masters*, 349 Ill. 455.) Megginson and plaintiff were engaged to be married at the time the contract was signed. A confidential relationship, therefore, existed between them and they were bound to act fairly and in good faith in their dealings with each other. Where the intended wife has knowledge or reasonably ought to have knowledge of the character and extent of the intended husband's property, an ante-nuptial agreement releasing statutory rights in the latter's estate in consideration of covenants of the intended husband will be held valid if the parties had legal capacity to contract. (*Brown* v. *Brown*, 329 Ill. 198; *Landes* v. *Landes*, 268 id. 11; *Colbert* v. *Rings*, 231 id. 404.) Similarly, if surrounding circumstances are sufficient to show that the intended wife reasonably should have had knowledge of the intended husband's property, an ante-nuptial contract, even where the parties are engaged, will be sustained. (*Brown* v. *Brown, supra; Landes* v. *Landes, supra; Yarde* v. *Yarde*, 187 Ill. 636.) On the other hand, if the contract contains no provision for the prospective wife, or if it is disproportionate to the extent and value of the property of the intended husband, a presumption obtains that the execution of the instrument was procured by designed concealment of the amount of the husband's property. (*Slater* v. *Slater*, 310 Ill. 454.) Such a presumption, however, is not evidence, and as soon as contrary evidence is produced the presumption vanishes. (*Geiger* v. *Merle*, 360 Ill. 497.) The burden in such cases rests upon those claiming against

the wife to prove that she had full knowledge, or that circumstances were such that she ought to be charged with full knowledge, of the extent and value of his property at the time the contract was executed. *Debolt* v. *Blackburn,* 328 Ill. 420; *Parker* v. *Gray,* 317 id. 468.

The contract, itself, specifically states, as a compelling reason for its execution, the fact that Megginson was the father of nine children, who, together with their mother, had participated in his life and work while he was accumulating the estate he then possessed. There would be little or no reason for making ante-nuptial contracts prescibing the rights of a husband and a wife in the property of each other, if such agreements did not provide that one or both parties to a contemplated marriage should receive less from the estate of the other than he or she would acquire under applicable statutes of descent. In the present case the ante-nuptial agreement, its general purpose and the circumstances attending its execution, express the manifest intention of the parties that, except to the extent provided in the agreement, Megginson should retain the absolute ownership and control and the complete right of disposition of his property, and that plaintiff should surrender all right, estate and interest in the property which would otherwise accrue to her as a legal consequence of the marriage.

Plaintiff urges, however, that the provision for her was so grossly inadequate as to render the entire agreement void. The statutory share plaintiff would have received upon Megginson's death, in the absence of a testamentary disposition under the law as it obtained in 1921, would have consisted of her dower rights as a widow, namely, an estate for life in one-third of her husband's real property. (Smith-Hurd Stat. 1921, p. 703.) Plaintiff's dower rights, upon marriage, in the absence of a contract, would, however, have remained inchoate as long as Megginson lived. On the other hand, payment of the note for $5000 was not conditioned upon survival of her husband. The

master found its present worth, at the time the contract was executed, to be $3000. He found, further, that the value of the provision made for her in the marriage agreement was equal to forty per cent of the then present value of her inchoate right of dower. Manifestly, the mere fact that the wife will not receive as much from her husband's estate as she would had no ante-nuptial contract been executed does not afford ground for holding the contract invalid. (*Landes* v. *Landes, supra.*) For more than a year and seven months prior to the execution of the challenged contract, plaintiff and Megginson had been engaged to be married. The record discloses that plaintiff was then a highly intelligent young woman, thirty-three years of age, and, herself, the owner of property. It is conceded that she knew Megginson owned two farms, constituting the bulk of his estate. His description of his real property was sufficient to enable plaintiff, by the application of ordinary intelligence, to verify his statement. Although admitting there were persons from whom she could have ascertained the value of Megginson's land, plaintiff stated that she did not desire so to do. The foregoing testimony rebuts any possible presumption of concealment on Megginson's part. Considering the great disparity of age of the parties to the contract, the fact that plaintiff had lived all her life in the community in which Megginson's farms were located, the extended period of engagement, and, in particular, the express provision in the contract itself, that plaintiff well knew her prospective husband could make a settlement upon her many times larger than $5000, if he deemed it equitable, the conclusion is inescapable that plaintiff knew, or deliberately chose not to ascertain, the value of her prospective husband's estate. Moreover, when all the facts and circumstances are considered it cannot be said that the provision made for plaintiff in lieu of dower was disproportionate to the value of her husband's property in 1921.

It is true, plaintiff, as a rebuttal witness, testified that prior to executing the contract Megginson told her he was worth between $20,000 and $25,000, and had a small checking account out of which he paid his living expenses. Defendants objected to her testimony in this regard on the ground that she was incompetent to testify to anything happening before Megginson's death. The witness testified, further, that she believed what he said and made no inquiry of others, relying upon his statements when she signed the contract. Like objections were interposed to these answers. Again, over objection, she explained that she considered the contract binding during her married life for the reason she had never consulted an attorney with respect to its validity. The foregoing testimony did not come within the third exception of section 2 of the Evidence act, and, upon objection by defendants, it was inadmissible under said section 2, (*Geiger* v. *Merle, supra,*) notwithstanding the fact that defendants cross-examined upon it.

The statements attributed to Megginson by witnesses Kessinger and Stalcup were made a decade after the contract was executed and to persons with whom he had never had business dealings. The master, by his report, evidently did not place much reliance on their uncorroborated testimony. While the report of the master is only advisory, nevertheless, he had the advantage of seeing and hearing these witnesses. The chancellor, in this case, had no better opportunity to determine their credibility than has a court of review. We have recently had occasion to observe that the evidence of admissions made by persons since dead should be carefully scrutinized and considered with all the evidence in the case, as it is likely to be abused. *Fierke* v. *Elgin City Banking Co.* 366 Ill. 66; *Moreen* v. *Estate of Carlson,* 365 id. 482.

To sustain the decree plaintiff contends, further, that the note was not delivered to her at the time of the signing of the contract and that it was, hence, wholly executory.

The agreement expressly states the note was delivered to plaintiff concurrently with the execution of the contract. William Megginson testified that, after his father's death, an envelope marked, "This envelope contains the property of Mabel T. Megginson," containing not only the contract and note, but also plaintiff's securities and her savings account pass-book, was found in his father's safety deposit box at a bank in Jacksonville and turned over to plaintiff, who examined the contents of the envelope. Other documents, personal to plaintiff, such as her will and her lodge receipts, were kept in her husband's box. George Megginson corroborated his brother's testimony in essential particulars. He added that his father's copy of the contract was found in an old newspaper near the bottom of the box. Plaintiff, upon interrogation by the guardian *ad litem*, although denying receipt of the envelope, admitted that the executors gave her the note and her copy of the contract on November 27, 1934, but insisted she did not know these two instruments were turned over to her until she later examined her papers preparatory to placing them in her own safety deposit box. So far as the record discloses plaintiff rented a safety deposit box for the first time on or after November 27, 1934. Under these circumstances it was not unusual for her copy of the contract and the note to be in her husband's box for safekeeping. The testimony narrated is ample to prove a *prima facie* delivery of the note. It was not essential to the delivery of the note—or the validity of the contract—that it be manually transferred to plaintiff and placed in her physical possession. The acts of the parties at the time of the execution of the documents and thereafter, previously set forth, including assertions of plaintiff that she deemed the contract binding upon her, and the provision of Megginson's will, specifically providing for payment of the note, evidenced their intention and confirm our conclusion in this respect.

*Sarasohn* v. *Kamaiky,* 193 N. Y. 203; 13 Corpus Juris, Contracts, p. 308.

Plaintiff argues, however, that the inventory filed in the conservatorship proceedings by her husband demonstrated that he did not have the note in his possession as her conservator, and explained and contradicted the *prima facie* evidence. Megginson scheduled $1500 in United States government securities and a savings deposit of $574.58, as the only property owned by his wife. The promissory note for $5000 was not listed. Evidence is wanting to show that Megginson either knew or thought the note should be listed, or that his attorney advised him to schedule it. The law recognizes that omissions in listing property are likely to occur, and provides for the filing of supplemental or additional inventories. Failure to list the note does not tend to support plaintiff's claim of non-delivery.

Plaintiff argues, further, that the contract was wholly executory, even if delivery of the note be conceded, because the language of the contract shows it was not the intention of the parties that the note itself should constitute payment of the amount specified. Our attention is directed to the third section of the contract which states that "said party of the second part accepts said five thousand ($5000) dollars *when paid,* in full of all her rights and interests in and to any and every part of the estate of the said party of the first part." It does not follow that the note was an unenforceable obligation on the day it was signed. The note evinces the intention of Megginson to furnish an additional safeguard for the enforcement of plaintiff's rights under the contract against his estate. From and after December 9, 1921, plaintiff owned the note and, upon her husband's death, could compel its payment. A similar situation obtained in *Morris* v. *Masters, supra.* In that case the prospective wife promised to pay a stipulated sum to her intended husband "upon her decease" or cause the amount to be paid within a year after her death, in consideration of his re-

lease of all claims against her estate. The parties were married and subsequently the wife died intestate. In rejecting the contention that the ante-nuptial agreement was an executory contract this court held that promises to pay at or after death are frequently used to bind the estate of the maker with the intention, merely, of creating obligations enforceable against the estate. The court said: "The ante-nuptial contract, without any further act on the part of Mrs. Morris being necessary, imposed upon her personal representatives the obligation to pay appellant [the husband] the money specified within one year after her death, and he was to receive the money in full of all his interest in the estate. The tender made by the administrator within the year was a complete compliance with the agreement." Similarly, in the present case, the contract, not having been rescinded or modified during Megginson's life, became absolute upon his death, irrespective of the testamentary provision for payment of $5000 to plaintiff. Her contention that the contract assailed was wholly executory prior to Megginson's death cannot be sustained.

Plaintiff contends, finally, that the birth of her daughter, a minor living with her and Megginson, as a member of his household when he died, rendered the contract void. This contention rests in part upon the false premise that the ante-nuptial agreement was executory. Reliance is placed on *Zachmann* v. *Zachmann*, 201 Ill. 380. In that case an ante-nuptial contract provided for the payment of a gross sum out of the husband's estate for the release of the widow's award, dower and homestead rights. A child was born to the parties after their marriage. The husband died ten years later. Upon review, this court declared the contract wholly executory and held that the widow could repudiate the provision for the waiver of homestead and widow's award, and, further, since the sum specified could not be apportioned the agreement was wholly inoperative and did not affect dower. In reaching this conclusion the

court limited its decision to the factual situation presented, saying: "If the appellant [widow] had no interest in the property of the said Christian Zachmann, deceased, either real or personal, other than the right of dower, a different question as to the force and effect of the ante-nuptial agreement would be presented." In *Kroell* v. *Kroell,* 219 Ill. 105, this court, speaking through Mr. Justice Cartwright, pointed out that the decision in the *Zachmann case,* to the effect dower of the widow was not waived, rested upon the ground "that the consideration could not be apportioned, which reason would not apply in a case where no question of apportionment is involved. If heirs should be willing that the entire consideration should be paid for that which was lawfully released, the widow would not be entitled to dower because there could not be an apportionment."

Defendants concede that, under the circumstances present in this case, the contract would not release plaintiff's award as Megginson's widow, nor her right to a homestead. In their pleadings, and, again, upon the hearing, they offered to pay to plaintiff $5000, with interest, in satisfaction of the note, irrespective of whether she was entitled to a homestead estate in the residence property. Payment was properly tendered to plaintiff by the defendants, other than the minor child. The record further shows that plaintiff accepted a widow's award made in her behalf. Manifestly, the question of apportionment of the gross sum provided for plaintiff in the contract does not arise here. Plaintiff is, therefore, in no position to invoke the rule announced in the *Zachmann case,* as she will receive the entire consideration for the release of dower, in addition to receiving a homestead interest and her widow's award.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to enter a decree dismissing plaintiff's amended complaint for the want of equity. *Reversed and remanded, with directions.*