LENA GOLDFARB LIGHTMAN, Appellant,
v. MITCHELL S. MAGID, SR., etc., et al.,
Appellees. —394 S.W.(2d) 151.

Middle Section. May 10, 1965.

Certiorari Denied by Supreme Court August 16, 1965.

Howard F. Butler, Nashville, for appellant.

Elkin Garfinkle, Nashville, for appellees.

S. Ralph Gordon, Nashville, Guardian ad Litem, for minor defendants.

HUMPHREYS, J. Complainant Lena Goldfarb Lightman has appealed from a decree dismissing her bill to set aside the following antenuptial marriage contract, and has assigned errors making the contention her bill should have been sustained.

## "CONTRACT"

"WHEREAS, The parties to this instrument are contemplating their engagement, marriage and establishing a home together, and

"WHEREAS, Harry Lightman is a man of wealth, and

"WHEREAS, the parties have agreed as to their rights and interest in the property said parties may have or may hereafter acquire.

"Now, therefore, for and in consideration of the mutual benefits to be derived therefrom and in consideration of the engagement and marriage of said parties, said parties agree and bind themselves as follows:

"1. The parties hereto agree to become engaged and enter into the marriage relation and live together as husband and wife.

"2. All property now belonging to said parties on or before the date of said marriage and all properties hereafter acquired by said parties, shall be the sole and separate property of each of said parties with all rights and privileges therein as though they were unmarried, each party owning his or her property separately and free from all marital rights of the other.

"3. Each party shall have the right to sell, mortgage, transfer and convey his or her separate property without the joinder of the other in any instrument or conveyance.

"4. In the event Lena Goldfarb predeceases Harry Lightman, he shall have no interest in any estate she may leave.

"5. In the event Harry Lightman predeceases Lena Goldfarb, she shall receive $40,000.00 or $400.00 per month as long as she may live. She shall make an election as to her choice and the said Harry Lightman binds his Executor, Administrator and estate to the payment or payments as she may elect as herein provided; and,

"Be it further provided in the event said Lena Goldfarb elects the monthly payment provision, the Executor or Administrator of the estate of Harry Lightman may purchase annuity policy providing for said payments in an insurance company licensed and doing business in the State of Tennessee.

"6. Should Lena Goldfarb file a divorce proceeding against Harry Lightman and should the Court hold that she is entitled to a divorce, she shall receive as alimony $25,000.00 in full settlement of all claims which she may have against him.

"7. In the event any provision in this agreement shall be held invalid, the invalidity of such provision shall not affect the other provisions of this agreement, said provisions being severable.

"8. Harry Lightman is a resident of Nashville, Tennessee, and the parties agree to make their home at Nashville, Tennessee, and this agreement shall be regarded as a Tennessee contract and construed under the laws of the State of Tennessee.

"IN WITNESS WHEREOF, the parties hereto have set their signatures on this ——————— day of July, 1958.

"/s/ Lena Goldfarb
/s/ Harry Lightman"

"Acknowledgements of both parties. Tr. pp. 2-3

By her bill she sought to have the prenuptial contract between herself and one Harry Lightman, deceased, set aside on the ground she had been defrauded in its making, in that there had been no disclosure by Lightman to her of the nature and extent of his assets, and that she signed the contract thinking he was not a rich man because he wore a dirty, torn suit with egg on it, his automobile was always in bad repair, and because he told her that if they would be careful they could manage to get along on his income. She alleged she signed the contract only after Lightman called her from Nashville and told her to sign it and mail it back, that it was "to protect her from the bastard children that would try any means to trick her out of it" ("it" evidently referring to her interest in his estate), and that this constituted coercion and undue influence. That she signed the contract without realizing its effect, or understanding its contents, and without being advised or aware or even being interested in the extent of Lightman's property. That her only concern was that she loved him and wanted to get on with the marriage.

In addition to this she made a number of allegations with respect to his mistreatment of her, all of which pictured Lightman as a very undesirable character, but which are irrelevant to the issue whether she was defrauded by a failure to make a disclosure of assets. She also alleged that shortly after their marriage he commenced to transfer his property to his grandchildren and others to defeat her interest therein, but these allegations and the proof thereof are material only in event the Chancellor was wrong in not voiding the contract. Additionally, she made allegations with respect to Lightman's illicit relationships with other women, but these, too, are

immaterial except as they may reflect upon Lightman's general unworthiness, and serve to hold him up as the sort of fellow against whom issues ought to be decided if there is any doubt about them.

She exhibited Lightman's will by which he disposed of his estate, except for certain small bequests, to his grandchildren, and her dissent therefrom in the Davidson County Probate Court.

The executors defended on the ground complainant was advised of Lightman's financial status prior to executing the agreement. That she had possession of the agreement in Phoenix, Arizona for more than a week, during which time Lightman was in Nashville. That she was at home with friends, business associates, and acquaintances, and so had ample opportunity to fully investigate the nature and effect of the contract. That under these circumstances there was no coercion or undue influence on her executing it. Defendants relied on the fact the contract states at its beginning that Lightman is a man of wealth, and argue this was a sufficient disclosure, and say that if it was not disclosure enough, it certainly advised complainant with respect to Lightman's general financial status and so put her on notice as an experienced business woman to consider before entering into marriage the matter of Lightman's wealth and the portion of it that she was being provided with.

The Chancellor wrote an excellent opinion, finding that the contract advised complainant Lightman was a man of wealth, and that she signed the contract without any coercion or undue influence. That she had not been overreached or defrauded. That her testimony was so evasive, contradictory, and inconsistent he could not believe her protestations she married Lightman solely for love, un-

aware of the nature of the contract and its consequences, and without any notice Lightman was a rich man. He held under the circumstances of the case and in view of there being no engagement between the parties, there was no burden on the defendants to prove a full detailed disclosure of Lightman's assets had been made to complainant prior to the making of the contract, that this was unnecessary on Lightman's part. He held the amount was not so disproportionate or inadequate as to invalidate the contract.

The assignments of error, two in number, are quite general, but when considered in connection with the argument do raise the question made by the bill, whether the contract should not be set aside because there was no detailed, sufficient disclosure of Lightman's assets prior to its making, and because of fraud and undue influence in its execution.

We have concluded to the contrary.

We adopt the Chancellor's findings of fact, as we find these to be sustained by the record. In fact, we adopt his memorandum which we find to be correct in both its conclusions of fact and law.

It appears Mrs. Lightman first learned there was such a person as Harry Lightman from a friend, Mrs. Bloom, who met Lightman one evening at dinner at the home of mutual friends in Nashville. Lightman, who was a widower at the time, about seventy years old, with children and grandchildren, on being questioned by Mrs. Bloom, expressed an interest in marrying again. When Mrs. Bloom returned to Phoenix she told Mrs. Lightman, who was then Mrs. Lena Goldfarb, about Mr. Lightman, and arrangements were made and pictures of Mrs. Goldfarb

were sent to Lightman. Liking what he saw in the pictures, Lightman then went to Phoenix, arriving there on a week-end in June 1958. He spent approximately six days there, and when he had to leave, asked Mrs. Goldfarb to marry him and return to Nashville with him. This proposal was declined on the grounds she was the assistant manager of a diamond and jewelry department in a large Phoenix department store and had promised the manager who was away on a trip she would attend to the department in his absence.

Shortly, Lightman sent her the marriage contract through the mail. She says she did not know what it was, hardly read it, paid no attention to it. That she loved Lightman so much the contract was unimportant and that she was perfectly willing to marry Lightman without bothering to secure her future by such a contract. She says however, that on receiving a call from Lightman in which he insisted that she do so because the contract would protect her against his children, she signed and returned it to him.

The proof is that thereafter, without seeing each other again, they met in Birmingham, Alabama, where they were married. They then returned to Nashville and took up life together. Mrs. Lightman testified that all during their marriage he was cruel to the point of being unbearable; that he transferred his property to defraud her rights therein; that he was stingy and their scale of living was low; that he had affairs with other women. That once she consulted a lawyer but took no action.

With respect to the execution of the contract, we find these facts: That Mrs. Lightman, a widow, 58, was a knowledgeable, experienced business woman who operated and managed her own business for many years, and

had for some years been assistant manager of a diamond and jewelry department in a large Phoenix, Arizona department store. She was familiar with contracts, having used them in business. She had the contract in her possession in Phoenix, Arizona, away from Lightman who was in Nashville, for several days. Phoenix was and had been her home for sometime, and she had friends there with whom she could counsel and advise about signing the contract. Prior to signing it she took it to a notary public who was also a lawyer and left it there for at least two days, possibly longer. She was advised by the first statement in the contract that Lightman was a man of wealth and in view of her experience both by reason of previous marriage and by reason of her business experience, she was put on notice by this provision and by the express, clear, limiting provisions that followed that the purpose of the contract was not to vest her with any interest in any property and so ''to make her safe from Lightman's children,'', but was for the purpose of limiting the interest she would acquire in Lightman's estate by marrying him. A perfectly reasonable and to be expected arrangement in view of their respective ages, seventy-one and fifty-eight, and the extreme unlikelihood that there would be any children of their union, and the fact that Lightman had grandchildren to whom he wished to leave the bulk of his estate.

We also find as did the Chancellor that Mrs. Lightman discussed her future husband's financial condition with Mrs. Bloom.

Winnowing her testimony for such truths as can be found, which are few as she was evasive, contradictory and inconsistent, we think she was aware she was marrying a rich man, aware that the contract limited her in-

terest in his estate, aware that its provisions would be all she could expect. That she was not unduly influenced or overreached. That she was not defrauded in the execution of the contract and that the contract should not be set aside on these grounds. We think it is too much to ask us to believe that appellant, who is an intelligent widow, with business experience, and a good job, and style, and class, and social graces Lightman never had, would, in the first instance, be a party to contracting a prospective husband as far away from Phoenix as Nashville, and, upon his arrival, finding him in a dirty, torn suit, with egg on it, and a broken down car, would then quit her job and leave friends and loved ones and remove to Nashville after six days of association, going off with the dirty old man purely for love and with no thoughts for the future, making no inquiry about him and his assets; without, in fact, satisfying herself fully about what she was getting into. This is a most unlikely thing to happen. And, it is not to be unexpected that in trying to explain it Mrs. Lightman was most unconvincing.

It is not contradicted but that Lightman did not furnish complainant with a list of his assets nor make any disclosure thereof other than the statement in the contract. Nor, does it appear that complainant on being put on notice Lightman was a wealthy man, made any further inquiries of him concerning this, other than her talk with Mrs. Bloom, or requested any disclosure of assets. So we reach the only really serious contention made in this Court, whether or not the contract is void and should be set aside for this reason.

There appears to be more or less universal agreement among the courts on the subject of marriage settlements. Our cases are in line with the cases in other

states as these are summarized in 41 C.J.S. Husband and Wife, Part III, Marriage Settlements. Briefly, this authority, and our cases as far as they go, establish these propositions. That marriage settlements are ordinarily intended to provide for stability in the maintenance and support of the wife. They are regarded with favor and as not being against public policy. They are enforceable even against the rights of third persons. To be valid, they must be entered into freely, fairly, knowingly, understandingly, and in good faith by parties legally competent to contract, and the consideration therefor must be sufficient and free from fraud, deceit, imposition or overreaching. The validity of such a contract depends on the circumstances of the particular case, and it is the duty of a court of equity to rigidly scrutinize these circumstances to see that there is no unfairness in the contract. That a confidential relationship exists between a prospective husband and wife who execute an antenuptial agreement while they are engaged to be married which requires the utmost good faith and full disclosure of all circumstances materially bearing on the contemplated contract. And, although it is the general rule that the burden of proving a full, frank, fair disclosure is ordinarily on the husband, this is not so where the parties are along in years, have children who have a right to be provided for, or where the facts and circumstances contravene the idea of a confidential relationship. As for instance in cases of convenience marriages between people along in years. 41 C.J.S. Husband and Wife secs. 75, 76, 79 and 80. Also 30 C.J. p. 660, Note 80. Williamson v. First National Bank, 111 W.Va. 720, 164 S.E. 777; Megginson v. Megginson, 367 Ill. 168, 10 N.E.(2d) 815; Juhasz v. Juhasz, 134 Ohio State 257, 16 N.E.(2d) 328, 117 A.L.R. 933.

■ In 30 C.J. Husband and Wife, at page 660, it is said that where the facts and circumstances indicate the marriage is one for the convenience of the parties and so it would be unreasonable to suppose there actually was a confidential relationship there is no burden of disclosure.

Spurlock v. Brown, 91 Tenn. 241, 18 S.W. 868 and other Tennessee cases are not to the contrary, but are in line with the law as stated.

■ Mrs. Lightman's counsel argues quite forcefully that the burden of proving a full disclosure of Lightman's property was on the executors and that they did not prove this and that in the absence of such proof, on this account alone, this contract should be voided. However, we find ourselves unable to agree with counselor on this proposition. The rule is, as appears from the authority we have cited, that the burden of proving full disclosure of assets is only on the husband or his representative where, on account of an engagement to marry between the parties, they occupy a confidential relationship, or where the facts and circumstances surrounding the transaction fairly generate the inference there was such a confidential relationship, with this latter question to be looked into and considered from the point of view that a confidential relationship probably existed. But, where as in this case (1) the parties were not engaged prior to the contract; (2) we have an elderly, previously married couple, one with grandchildren; (3) we have one of them rich and a good business man and the other with a good job and being a good business woman; (4) we have the unusual circumstances of their meeting, the duration of the courtship, the obvious disparity in their personal appearances, one dirty, the other rather elegant, their residences widely separated; (5) we have a

contract which is clearly not for the purpose of guarân-teeing stability to the marital relationship by providing for a fixed portion of the husband's property for the wife, but is expressly for the purpose of limiting her interest therein; (6) we have the circumstance of the contract being in complainant's hands for days during at least two of which it was in the office of a lawyer, we do not have a confidential relationship existing between the parties at the time of the making of the contract, and the rule does not apply as appellant insists.

 While there is no assignment of error making the contention the contract should have been invalidated by the Chancellor on the ground of gross disproportion of the estate and the amount to be paid Mrs. Lightman, and there is in fact no specific allegation in the bill that the contract is void on this ground, but only the general allegation that the disproportion and inadequacy is evidence of fraud, we have, on account of the authorities cited and the argument made in the appellant's brief, and the general statements on the subject in the original bill, considered this, and we are of opinion the contract is not invalid on this ground.

 Having held there was no fraud and no confidential relationship we think this rule applies: 41 C.J.S. Husband and Wife sec. 97.

"The rule under which inadequacy or disproportion of the provision for the wife raises a presumption against the husband and throws the burden on him or on those claiming under him of proving fairness or knowledge applies where the parties were engaged to be married at the time of the agreement and a confidential relationship existed between them; but it is inapplicable where they were not engaged or where no

confidential relationship existed at the time. The burden of proving that there was an engagement to marry rendering the relations confidential rests on the wife or those claiming under her, and she does not sustain this burden merely by showing that the antenuptial contract recited that it was made in contemplation of marriage.'' 41 C.J.S. Husband and Wife sec. 97, p. 571.

$40,000.00, or $400.00 a month, is not a niggardly sum. It will maintain complainant in comfort for the rest of her life. And, while complainant is now sadder and wiser, and will likely know more of her next husband's habits and character than can be learned in a six day meeting (although an elderly man, wealthy enough to guarantee $25,000.00 on divorce or $40,000.00 on death, but went around, and came to the wedding in an old suit with egg on it, and with a broken down car, should in itself have been warning enough) she is, after all, $40,000.00 richer.

For the reasons mentioned, the assignments of error are overruled and the decree of the Chancellor is affirmed.

Shriver and Puryear, JJ., concur.