802 P.2d 438

**In re the Marriage of William M. NANINI, Petitioner/Appellee,**

v.

**Rosemary D. NANINI, Respondent/Appellant.**

No. 2 CA-CV 90-0075.

Court of Appeals of Arizona, Division 2, Department B.

Nov. 29, 1990.

---

Snell & Wilmer by Michael J. Rusing, Tucson, for petitioner/appellee.

Lesher & Borodkin by Robert O. Lesher, Tucson, for respondent/appellant.

## OPINION

HOWARD, Judge.

This is an appeal from the granting of a partial summary judgment entered in the husband's favor in an action for dissolution of marriage.

## FACTS AND PROCEDURAL BACKGROUND

The trial court's order pursuant to Rule 54(b), Ariz.R.Civ.Proc., 16 A.R.S., that there was no just reason for delay, gives us jurisdiction to hear this appeal.

We consider the facts in the light most favorable to the wife. *Gibraltar Escrow Co. v. Thomas J. Grosso Investment, Inc.,* 4 Ariz.App. 490, 421 P.2d 923 (1966).

The parties met in Chicago, Illinois in the mid 1960s and ultimately were married there on March 22, 1969. It was the second marriage for each. The husband was in the construction business and the wife had a successful clothing store in Chicago for about 20 years prior to the marriage. She was well-educated and during the time that she had been in business, she had never required the services of an attorney.

Five days prior to the marriage, the husband took her to his lawyer's office. She had no idea why they were going there until she was presented with a document identified as an antenuptial agreement. The agreement provided that the property then owned by each party together with the rents, issues and profits would remain the sole and separate property of the party after the intended marriage and that neither party had any right, title or interest in respect to this property. It also provided that if either party died without leaving a will, the estate of such party would go to the heirs-at-law of the deceased party as though the parties had never been married. There were also provisions that each party would retain as his or her sole and separate property, all earnings from his or her personal service or efforts after the marriage including the results, rents, issues and profits. The parties also agreed that the contract would be construed in accordance with and governed by the laws of the State of Illinois.

Although the agreement states that the wife was represented by attorney Richard T. Ryan of Chicago, and the agreement bears the signature of this attorney, the wife testified during her deposition that nobody ever explained the agreement to her in detail or counseled her concerning its

significance. However, she admits that she was advised to read it, had the opportunity to read it and did, in fact, read enough of it to understand that it provided that each party's property was going to be maintained as his or her own separate property after the marriage, which she felt was fair enough.

Financial statements of both parties which were initialed and attached to the agreement showed the wife's net assets to be worth $264,868 and the husband's net assets to be $1,158,385.37. However, the wife claimed in her deposition that no financial statements or other documents were attached to the agreement when she signed it. She testified at her deposition that she signed it as she was instructed to do because she was in love with the husband and would have signed whatever he put in front of her.

Prior to the marriage the wife knew that the husband was the owner of a huge construction company in Illinois with numerous pieces of equipment valued in the six digit range and that the husband's family owned a resort in Tucson. She also knew that her husband owned a home in Chicago located at the Shore Club. In her deposition she stated she assumed that at the time of the marriage her husband was worth in excess of the amount reflected in the financial statement which she claims was not attached to the agreement. Another financial statement prepared for another purpose, and dated 10 months later showed the husband's net worth to be $3,182,731.13.

Throughout the marriage the parties kept separate banking accounts, with the exception of one joint account for household purposes. The money was placed in the joint account by the husband. The husband also funded a joint stock account. In addition, each party had separate stock accounts as to which there was no evidence of commingling among the separate accounts, or between the separate accounts and the joint account. The wife refused to allow her stockbroker to tell her husband how much her separate stock account contained, and for a time she even had the account statements sent to a friend's address so that the husband would have no idea of her financial worth.

Because the husband paid the couple's ordinary expenses out of his separate property, including a $2,000 monthly allowance to the wife and payment of their joint taxes, the wife was able to amass a tax-free stock portfolio in her separate account worth over $2,000,000, yielding approximately $140,000 per year. She also had joint ownership of land worth over $1,000,000 and other securities.

The parties executed written agreements whenever they did purchase anything jointly, and when the husband borrowed money from the wife he paid it back from his separate funds.

## THE WIFE'S CONTENTIONS

The wife contends that the trial court erred in entering summary judgment because there was evidence that the prenuptial agreement was not valid and binding because (1) there was an unrebutted presumption of fraud, (2) there was no evidence that the agreement was entered into freely and intelligently and, (3) the agreement has no application to the distribution of property in a case of dissolution of marriage.

## STANDARD OF REVIEW

On appeal from a summary judgment we must review the facts and evidence in the light most favorable to the party against whom the summary judgment was entered. *Gulf Insurance Company v. Grisham,* 126 Ariz. 123, 613 P.2d 283 (1980). If there is any doubt as to whether an issue of material fact exists, summary judgment is inappropriate. *Joseph v. Markovitz,* 27 Ariz.App. 122, 551 P.2d 571 (1976). Even if there is no factual dispute, summary judgment is unwarranted if possible inferences to be drawn from the circumstances are conflicting. *Northern Contracting Company v. Allis–Chalmers Corporation,* 117 Ariz. 374, 573 P.2d 65 (1977). The inferences must be viewed in the light most favorable to the party

opposing summary judgment. *Elerick v. Rocklin,* 102 Ariz. 78, 425 P.2d 103 (1967). However, the rule mandates the entry of summary judgment after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## VALIDITY OF THE AGREEMENT

The wife contends that because she did not know the total amount of her husband's net worth, there is a presumption of fraud in the inducement to enter into the agreement which the husband has not rebutted. She also contends that she could not have intelligently signed the agreement because she did not have advice of counsel. We do not agree with either of these contentions.

▮ The agreement, entered into in the State of Illinois, by Illinois residents, provides that the law of that state governed the contract. When the parties choose the law of a particular state to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied. Restatement (Second) Conflicts of Law § 187(1) (1971, revised May 19, 1988). Accordingly, we turn to Illinois authority.

▮ The Illinois law regarding the validity of antenuptial agreements is summarized in the case of *In re Estate of Hopkins,* 166 Ill.App.3d 652, 656, 117 Ill.Dec. 254, 256–57, 520 N.E.2d 415, 417–18 (1988):

> Antenuptial agreements are generally enforceable. (*Kuhnen v. Kuhnen* (1933), 351 Ill. 591, 600, 184 N.E. 874; *Eule v. Eule* (1974), 24 Ill.App.3d 83, 86, 320 N.E.2d 506.) The rules governing construction of other contracts are applicable to antenuptial agreements. (*Collins v. Phillips* (1913), 259 Ill. 405, 411, 102 N.E. 796.) Where the parties enter into such an agreement without fraud,

duress or coercion, the agreement is valid. (*In re Marriage of Burgess* (1985), 138 Ill.App.3d 13, 15, 92 Ill.Dec. 693, 485 N.E.2d 504.) However, where the parties are engaged to be married before the contract is signed, a confidential relationship exists, and if the provisions made for the wife are disproportionate to the extent and value of the husband's estate, the presumption is raised that the husband intentionally concealed his assets, and the burden shifts to those claiming the validity of the agreement to prove that the wife had full knowledge of the husband's property. *Debolt v. Blackburn* (1927), 328 Ill. 420, 425, 159 N.E. 790; *Yockey v. Marion* (1915), 269 Ill. 342, 347–48, 110 N.E. 34.

The presumption of intended concealment vanishes as soon as contrary evidence is produced. *Megginson v. Megginson,* 367 Ill. 168, 10 N.E.2d 815 (1937). Contrary to the wife's contention, it need not be shown that she knew the exact dollar value of the husband's property at the time of the execution of the agreement. In *Megginson,* the wife, who was trying to invalidate an antenuptial agreement, admitted that her husband had informed her that he had owned two farms, but contended that she was never advised further as to the nature and extent of his property. In upholding the agreement, the court in *Megginson* stated:

> ... It is settled that persons competent to contract may execute a valid antenuptial agreement.... Where the intended wife has knowledge, or reasonably ought to have knowledge, of the character and extent of the intended husband's property, an antenuptial agreement releasing statutory rights in the latter's estate in consideration of the covenants of the intended husband will be held valid if the parties had legal capacity to contract....

367 Ill. at 177, 10 N.E.2d at 819. The court went on to hold that the husband's description of his real property was sufficient to enable the wife, by the application of ordinary intelligence, to verify his statement.

Disregarding the fact that the agreement states that a detailed statement of Nanini's

assets is attached, here, the wife admitted that she knew the nature and extent of her husband's property and even believed it to be in excess of the amount the husband claimed its value to be on the financial statement which she claims she never saw.

The fact that all the ramifications of the agreement were not explained by a lawyer to the wife does not support the setting aside of the agreement. In the case of *In re Marriage of Kloster*, 127 Ill.App.3d 583, 82 Ill.Dec. 847, 469 N.E.2d 381 (1984), which involved a property settlement agreement, the husband attacked the settlement agreement on the grounds he did not understand it. The trial court rejected this argument holding that "[o]ne who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding or that the contract misled him. (Citation omitted.) ... Illinois courts look with favor upon amicably agreed property settlements and will not set them aside absent proof of fraud, duress, or variance with public policy." 127 Ill.App.3d at 585, 82 Ill.Dec. at 849, 469 N.E.2d at 383.

Here, the wife did read through the agreement enough to understand that it provided, as she stated in her deposition, "what was mine was mine and what was his was his." Furthermore, the evidence showed that for 20 years after the parties entered into the agreement she kept her property separate and apart from his to the extent that she refused to allow her broker to tell her husband how much it contained, had the account statements sent to a friend's address and succeeded at the time of trial in amassing over $2,000,000 in tax-free bonds, yielding $140,000 per year. Furthermore, as previously recited in the facts, the parties kept their finances separate in other ways.

## APPLICATION OF AGREEMENT TO DISSOLUTION OF MARRIAGE

The wife argues that the agreement does not mention the word "divorce" or the effect of a divorce and because when it was entered into it was against Illinois public policy to contract concerning the

parties' rights in connection with a later divorce, it is conclusive that the parties never intended that the agreement could govern the distribution of property in a divorce. This argument is based on two cases, one from Illinois, *Volid v. Volid*, 6 Ill.App.3d 386, 286 N.E.2d 42 (1972), and the Wisconsin case of *Levy v. Levy*, 130 Wis.2d 523, 388 N.W.2d 170 (1986). Neither of these cases supports the wife's argument.

In *Levy* the parties executed an antenuptial agreement concerning disposition of their property at death. The intermediate appellate court held that the parties must also have intended the agreement to apply to a dissolution of the marriage by divorce as well as death. The Wisconsin Supreme Court disagreed and held that by its plain language, the agreement only applied to death. The agreement here has no such limitations on its applicability. Therefore, it applies when there is a divorce.

In *Volid* the court upheld an antenuptial agreement which limited the amount of support on divorce. The wife contends that prior to the *Volid* case, it was against public policy in Illinois to provide such a limitation in antenuptial agreements. This contention is wrong. The Illinois court had not previously ruled on the validity of such a limitation in antenuptial agreements in the context of a divorce case, but had, as *Volid* recognizes, previously upheld the validity of antenuptial agreements by parties competent to contract.

We affirm the court's partial summary judgment and order that the parties shall bear their own attorney's fees for this appeal.

FERNANDEZ, C.J., and ROLL, P.J., concur.