2005 SD 34

**T. Denny SANFORD, Plaintiff and Appellee,**

v.

**Colleen Anderson SANFORD, Defendant and Appellant.**

**Nos. 23175, 23183 and 23197.**

Supreme Court of South Dakota.

Argued Jan. 11, 2005.

Decided March 9, 2005.

Rehearing Denied April 14, 2005.

Edwin E. Evans, Mark F. Marshall, Mitchell A. Peterson of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiff and appellee.

Thomas J. Welk, Lisa Hansen Marso of Boyce, Greenfield, Pashby & Welk, Sioux Falls, for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] T. Denny Sanford filed for divorce from his wife Colleen Anderson Sanford, and sought enforcement of a prenuptial agreement. The prenuptial agreement purported to waive all of Colleen's alimony rights and provided for a single payment structure for alimony, support and property provisions.

[¶ 2.] On competing motions for summary judgment, the circuit court held the single prenuptial agreement provision purporting to waive alimony was void and unenforceable. The circuit court also held the agreement was not unconscionable as to the property provisions, and that the void alimony and support provision could be severed from the remainder of the agreement. Colleen appealed contending the entire agreement was void as the alimony provision could not be severed from the property provisions. Colleen also contended that the entire agreement was unconscionable. Denny filed a notice of review claiming the entire document was valid and enforceable. We affirm.

## FACTS AND PROCEDURE

[¶ 3.] Colleen Anderson Sanford and T. Denny Sanford met in Sioux Falls, South Dakota, in 1987 while Colleen was visiting family. At that time, Colleen was living in Indianapolis, Indiana, and was approximately thirty-six years of age. Colleen had previously been gainfully employed as a dental assistant for eleven years, and then had co-owned a home accessory and gift business for eight years. Denny was fifty-two years of age at the time the two met, and had been divorced from his first wife for approximately five years. The two began a romantic relationship and eventually Denny asked Colleen to live with him, and stop working in order to be available to travel with him. Colleen declined an entry-level position with a financial planning firm in Indianapolis and at Denny's request moved to Minneapolis, Minnesota, in order to further the relationship. The couple signed a nonmarital partnership agreement in 1990. After living together for approximately eight years, the two decided to marry. The marriage was the first for Colleen and the second marriage for Denny. Denny had two grown children from a prior marriage, while Colleen had no children. The parties had no children during the marriage.

[¶ 4.] The parties executed a prenuptial agreement dated August 15, 1995, that was drafted by Denny's attorney. Colleen was represented by her own attorney. Each party attached financial disclosures to the agreement that showed a net worth of approximately $55 million dollars for Denny and a net worth of approximately $127,500 for Colleen.

[¶ 5.] Denny's financial disclosure statement was prepared in June 1995 using April 1995 valuations. The statement was not shared with Colleen or her attorney until August 15, 1995, after the wedding invitations had been mailed and two receptions had been planned and scheduled. The agreement was signed the next day,

on August 16, 1995.[1] In depositions, Denny admitted a bookkeeper prepared the financial disclosure statement. Colleen and Denny were married on September 23, 1995.

[¶ 6.] The prenuptial agreement provided in part:

Each party has had a full and satisfactory opportunity to inspect, reflect upon, and appraise the property of the other so that each is satisfied that he/she fully understands and appreciates the nature and value of the property of the other and the likelihood of its increasing or decreasing after the date hereof.

The agreement further provided that:

In the event of termination of the marriage between the parties, whether by annulment, divorce or otherwise, Denny agrees that he shall pay to Colleen the sum of One Hundred Forty-four Thousand and No/100 Dollars ($144,000.00) in thirty-six (36) equal installments of Four Thousand and No/100 Dollars ($4,000.00), payable on the first business day of the month following termination of the parties' marriage. If Colleen institutes an action for annulment or divorce and is awarded a decree of annulment or divorce from Denny, she shall be entitled to payments set forth above for a period not to exceed three (3) years from the date of commencement of such action. These payments shall cease in the event of Colleen's death or remarriage or cohabitation with an adult male to whom she is not married. The parties expressly agree that Colleen shall make no other claim against Denny in the event of dissolution of the marriage for any reason in the nature of support, alimony, property settlement or otherwise.

[¶ 7.] The agreement also provided that in the event that Denny should institute action for divorce or annulment and be awarded a decree of annulment or divorce from Colleen, he would be required to make the above payments to Colleen for no more than three years, and provide her with a condominium at Westward Ho Townhomes in Sioux Falls. In the event Colleen initiated such action, she would be entitled to remain in the marital residence following the grant of the annulment or dissolution for "a period of six (6) months plus one (1) year for each full year that the parties shall have been married prior to such action."

[¶ 8.] Denny filed a petition for divorce on January 28, 2003. Colleen filed an answer and counterclaim, alleging adultery and extreme cruelty. Denny moved for summary judgment on the issue of the validity and enforceability of the prenuptial agreement as to both the property settlement and spousal support provisions. Colleen moved for partial summary judgment, arguing the prenuptial agreement was invalid and unenforceable both as to property and spousal support.

[¶ 9.] The circuit court held the prenuptial agreement provision purporting to waive alimony was void and unenforceable. The circuit court also held the agreement was not unconscionable as to the property provisions, and that the property provisions could be severed from the invalid portions of the agreement.

[¶ 10.] Colleen and Denny both appeal. Their issues can be addressed as follows:

1. Whether a prenuptial agreement that provides, under its terms, a single payment structure for all support, alimony and property obligations is void and

---

1. There is no evidence that there was a substantial change in the assets or their value from the April 1995 valuation date to the date the document was signed.

unenforceable as to both property and alimony.

2. Whether the circuit court erred when it concluded the property settlement portion of the prenuptial agreement was not unconscionable.

## STANDARD OF REVIEW

[¶ 11.] Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15–6–56(c). We will affirm the circuit court only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Titus v. Chapman*, 2004 SD 106, ¶ 13, 687 N.W.2d 918, 923 (citing *Holzer v. Dakota Speedway*, 2000 SD 65, ¶ 8, 610 N.W.2d 787, 791) (additional citations omitted). All reasonable inferences drawn are viewed in favor of the non-moving party. *Id.* (citing *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990)). The moving party has the burden to clearly show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Id.*

[¶ 12.] The construction and interpretation of a contract is a question of law. *Prudential Kahler Realtors v. Schmitendorf*, 2003 SD 148, ¶ 7, 673 N.W.2d 663, 665 (citing *Kimball Investment Land, Ltd. v. Chmela*, 2000 SD 6, ¶ 10, 604 N.W.2d 289, 292) (citations omitted). Likewise, the construction and interpretation of a statute is a question of law. *Zoss v. Schaefers*, 1999 SD 105, ¶ 6, 598 N.W.2d 550, 552 (citing *Satellite Cable Srvs. v. Northern Electric*, 1998 SD 67, ¶ 5, 581 N.W.2d 478, 480). We review question of law under the de novo standard. *Therkildsen v. Fisher Beverage*, 1996 SD 39,

¶ 8, 545 N.W.2d 834, 836 (citing *Stang v. Meade Sch. Dist.*, 526 N.W.2d 496, 498 (S.D.1995)).

[¶ 13.] Statutory construction is used to discover the true intent of the legislature in enacting laws, which is ascertained primarily from the language employed in the statute. *State v. Myrl & Roy's Paving, Inc.*, 2004 SD 98, ¶ 6, 686 N.W.2d 651, 653 (citing *Martinmaas v. Engelmann*, 2000 SD 85, ¶ 49, 612 N.W.2d 600, 611). We give words their plain meaning and effect, and read statutes as a whole, as well as enactments relating to the same subject. *State v. I–90 Truck Haven Service, Inc.*, 2003 SD 51, ¶ 3, 662 N.W.2d 288, 290 (citing *Martinmaas*, 2000 SD 85, ¶ 49, 612 N.W.2d at 611) (additional citations omitted).

## ANALYSIS AND DECISION

[¶ 14.] **1. Whether a prenuptial agreement that provides, under its terms, a single payment structure for all support, alimony and property obligations is void and unenforceable as to both property and alimony.**

[¶ 15.] This Court previously held in *Connolly v. Connolly*, 270 N.W.2d 44 (S.D.1978), that provisions in a prenuptial agreement purporting to limit alimony obligations are against public policy and therefore not enforceable. In that case, the parties entered into a prenuptial agreement that purported to relinquish and release the other "from any and all claims of support and of any and all interest in the property of the other" except as provided by the agreement. *Id.* at 45. The agreement provided one single payment vehicle in the event of a divorce or legal separation: an annuity for the benefit of the wife in an amount designed to yield income equal to the benefits the wife would have received from her widow's pen-

sion, which she forfeited by marrying Mr. Connolly. *Id.*

[¶ 16.] Our opinion in *Connolly* reiterated the validity of the public policy underlying South Dakota's domestic relations code, that while parties may enter into a valid support agreement in contemplation of divorce, the trial court has the ultimate authority to approve or reject a spousal support agreement in a divorce proceeding. *Id.* at 47. We noted that "[t]he same principle should be applied even more strictly in an antenuptial setting, where as pointed out in the *Gudenkauf* case, conditions which affect a spouse's entitlement to alimony cannot accurately be foreseen." *Id.* (citing In re Marriage of Gudenkauf, 204 N.W.2d 586, 587 (IA 1973)) (internal citation omitted). Additionally, we invalidated the prenuptial agreement in that case "... to insure that the public's interest in the enforcement of [one spouse's] duty to support [the other spouse] is not thwarted by antenuptial agreements that bear no reasonable relationship to the subsequent situation of the parties." *Id.* at 47. In that case, the portion of the prenuptial agreement that sought to limit the wife's support rights was severed, and the single payment structure was retained for purposes of the property rights. *Id.* at 48.

[¶ 17.] In 1989, twelve years after *Connolly,* the South Dakota legislature adopted portions of the Uniform Premarital Agreement Act (UPAA) as SDCL 25–2–16 to 25–2–26. Under South Dakota law, a premarital agreement must be in writing and signed by both parties, and is enforceable without consideration. SDCL 25–2–17. SDCL 25–2–18, the code provision specific to prenuptial agreements, provides:

(a) Parties to a premarital agreement may contract with respect to:

(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

(4) The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

(5) The ownership rights in and disposition of the death benefit from a life insurance policy;

(6) The choice of law governing the construction of the agreement; and

(7) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

(b) The right of a child to support may not be adversely affected by a premarital agreement.

[¶ 18.] The South Dakota legislature did not include portions of the UPAA relating to spousal support. Specifically, the Legislature did not enact those portions of the UPAA that allowed parties to a prenuptial agreement to contract with respect to "the modification or elimination of spousal support."[2] The Minutes of the House Judi-

---

**2.** Forty-one states allow premarital waivers of spousal support, twenty-one by virtue of their legislatures' adoption of all or substantial por-

tions of the UPAA. Another eighteen have permitted waivers pursuant to judicial decisions. New York permits spousal support

ciary Committee meeting of February 7, 1989, indicate that this provision of the UPAA was eliminated from House Bill 1328 before its approval by the committee and its eventual enactment as SL 1989, ch. 216, § 3.

██ [¶ 19.] The primary sources for declarations of public policy in South Dakota are the state constitution, statutes and case law. SDCL 1–1–23; *Niesent v. Homestake Mining Co.*, 505 N.W.2d 781, 783 (S.D.1993) (citations omitted). We presume the Legislature acts with knowledge of our judicial decisions. *See In re State Highway Comm'n v. Wieczorek*, 248 N.W.2d 369, 372 (S.D.1976). The Legislature knows how to include and exclude specific items in its statutes. *State v. Young*, 2001 SD 76, ¶ 12, 630 N.W.2d 85, 89 (citing *Therkildsen*, 1996 SD 39, ¶ 10, 545 N.W.2d at 836; *Jasper v. Smith*, 540 N.W.2d 399, 403 (S.D.1995); *Sander v. Geib, Elston, Frost Pro. Ass'n*, 506 N.W.2d 107, 124 (S.D.1993)).

[¶ 20.] We must presume the Legislature acted purposefully when it enacted SDCL 25–2–18 and excluded spousal support rights from the list of enumerated subject matter upon which parties to a prenuptial agreement may legally contract. Equally so, we must presume when the Legislature adopted portions of the UPAA as SDCL 25–2–18, it proceeded with awareness of our severability analysis in *Connolly* and did not act to change it.

[¶ 21.] Denny argues that under SDCL 25–2–18(a)(7), alimony rights are a proper subject matter for a prenuptial agree-

ment.[3] Denny argues this Court should overrule *Connolly v. Connolly* as that case's supposition, that prenuptial agreements will be abused by men and that women will be exploited, no longer fits with the values and roles of women in today's society.

[¶ 22.] Denny's argument fails to recognize that the public policy underlying *Connolly* was meant to apply equally to the husband or the wife depending on the circumstances of the parties in any particular case. The *Connolly* opinion is not an antiquated, paternalistic attempt to protect women. Instead, it protects the support rights of both men and women who may be asked to sign away those rights in contemplation of marriage. Although much has been written on the subject, it still bases itself on SDCL 25–4–41, which is an ongoing authorization by the Legislature to the courts to award "support . . . as the court may deem just." That statutory mandate, until repealed by the Legislature, cannot go out of vogue. This issue is a question of statutory construction and cannot be changed by any other method. The sole authority to "modernize" our statutes by amendment belongs to our Legislature.

[¶ 23.] This is not the first time this Court has been invited to "modernize" the law of South Dakota concerning the legal relationships between individuals who are involved in a marriage that is in the process of failing. In *Veeder v. Kennedy*, 1999 SD 23, 589 N.W.2d 610, we were asked to abolish the tort of alienation of affections as it had been abolished in a large majority of the states. The tort had

---

waivers under other statutory authority. *In re Marriage of Pendleton & Fireman*, 24 Cal.4th 39, 99 Cal.Rptr.2d 278, 5 P.3d 839, 849 (2000).

**3.** The record contains no explanation for the reason Denny's counsel included the void alimony waiver in the prenuptial agreement giv-

en South Dakota's exclusion of the alimony waivers from SDCL 25–2–18. However, in light of the fact that an overwhelming majority of states permit alimony waivers, Denny's counsel may have included the provision anticipating that South Dakota would eventually follow suit.

been viewed by Justices of this Court in a previous case as "[an] archaic holdover[ ] from an era when wives were considered the chattel of their spouse." *Id.* ¶ 17, 589 N.W.2d at 615 (quoting *Hunt v. Hunt*, 309 N.W.2d 818, 821 (S.D.1981)). However, in *Veeder* we declined to abolish this tort as its source was a statute, not case law:

> The "public policy" argument of Kennedy cannot be supported by our system of law. SDCL 1–1–23 states that the sovereign power is expressed by the statutes enacted by the legislature. SDCL 20–9–7 which authorizes Michael's cause of action in this case is such a statute. Under SDCL 1–1–24 the common law and thus an abrogation of the common law are in force except where they conflict with the statutory will of the legislature as expressed by SDCL 1–1–23. We are unable to locate a single case in this jurisdiction where this Court has struck down a statute as a violation of public policy. As no constitutional defects are claimed by Kennedy, we are compelled to leave the cause of action intact and instead defer to the legislature's ability to decide if there is a need for its elimination. "[W]e are not legislative overlords empowered to eliminate laws whenever we surmise they are no longer relevant or necessary."

*Veeder*, 1999 SD 23, ¶ 23, 589 N.W.2d at 616 (quoting In re Certification of Questions of Law (Knowles), 1996 SD 10, ¶ 66, 544 N.W.2d 183, 197).

[¶ 24.] Moreover, Denny's "modernization" argument fails to consider the numerous types of alimony that exist in this State and the diverse reasons for their award. Perhaps the most well-known is permanent alimony. Although its specifics are determined by the facts of the case, common to it are payments which continue until death of the recipient or some other significant event such as remarriage, which terminates the need for the continuing support.[4] Its basis is that the law makes provision for a spouse out of the estate of the other spouse after separation in lieu of the common law obligation to support the spouse had the marriage continued. *Guinter v. Guinter*, 72 S.D. 554, 557, 37 N.W.2d 452, 453 (1949). Secondly, there is lump sum alimony, which is in many respects similar to a property division. *See Saxvik v. Saxvik*, 1996 SD 18, ¶ 13, 544 N.W.2d 177, 180. However, it differs in that it may be based in part upon a consideration of fault. *Clarke v. Clarke*, 478 N.W.2d 834, 837 (S.D.1992) (citations omitted). A third type of alimony is restitutional or reimbursement alimony, which "has as its purpose to reimburse one spouse's contribution during the marriage to advance training or education of the other spouse." *Saxvik*, 1996 SD 18, ¶ 13, 544 N.W.2d at 180 (citing *Parsons v. Parsons*, 490 N.W.2d 733, 735 (S.D.1992); *Wilson v. Wilson*, 434 N.W.2d 742, 745 (S.D. 1989)). There is also rehabilitative alimony, which "is designed to permit a spouse the means necessary to enable the spouse to refresh or enhance job skills necessary to become self-sufficient, and provide needed financial support." *Id.* ¶ 14 (citing *Johnson v. Johnson*, 471 N.W.2d 156, 163 (S.D.1991); *Hautala v. Hautala*, 417 N.W.2d 879, 882 (S.D.1988)). Finally, some types of alimony may allow future modification which "is predicated on the

---

4. Factors which are considered in the need for alimony and its amount and duration are: "(1) length of the marriage; (2) respective earning capacity of the parties; (3) their respective age, health and physical condition; (4) their station in life or social standing; and

(5) relative fault in the termination of the marriage." *Anderson v. Anderson*, 2002 SD 154, ¶ 12, 655 N.W.2d 104, 107 (citing *Urban v. Urban*, 1998 SD 29, ¶ 8, 576 N.W.2d 873, 875; *Christians v. Christians*, 2001 SD 142, ¶ 16, 637 N.W.2d 377, 381).

belief that a trial court cannot foresee all circumstances which may arise after the original decree is entered." *Foley v. Foley,* 429 N.W.2d 42, 46 (S.D.1988).[5]

[¶ 25.] Unlike alimony and support rights, property rights are a proper subject matter for a prenuptial agreement. SDCL 25–2–18. However, as noted previously, a prenuptial agreement that purports to waive alimony and support and makes a distribution of property will not be enforceable as to the portion of the agreement that waived alimony and support. *Greene v. Morgan, Theeler, Cogley & Petersen,* 1998 SD 16, ¶ 3, 575 N.W.2d 457, 458 (citing *Connolly,* 270 N.W.2d at 46). Those portions of a prenuptial agreement that are valid will be enforced despite the presence of invalid provisions within the agreement. *Connolly,* 270 N.W.2d at 47–48. This comports with the presumption under South Dakota law "that a written agreement proclaims the ultimate intention of the parties." *Roth v. Roth,* 1997 SD 75, ¶ 17, 565 N.W.2d 782, 786 (citing *Carr v. Benike, Inc.,* 365 N.W.2d 4, 6 (S.D.1985)).

[¶ 26.] Colleen argues that portions of prenuptial contracts are separable or divisible only when the requirements of *Thunderstik Lodge, Inc. v. Reuer,* 2000 SD 84, 613 N.W.2d 44, are met. In that case we held the requirements of a severable agreement are: "(1) the parties' performance must be separable into corresponding pairs of part performances and (2) the parts of each pair must be regarded as agreed equivalents." *Id.,* 2000 SD 84, ¶ 7, 613 N.W.2d at 46 (citing *Commercial Trust and Sav. Bank v. Christensen,* 535 N.W.2d 853, 857 (S.D.1995)). Two additional conditions are generally required, "the agreement must not be an integrated scheme to contravene public policy," and "the party seeking enforcement must not have engaged in serious misconduct." *Id.* (quoting *Commercial Trust and Sav. Bank,* 535 N.W.2d at 857 (citing E. Allen Farnsworth, Contracts, § 5.8, at 382 (2d ed. 1990); Restatement (Second) of Contracts § 183 (1979))). Serious misconduct in the context of severability is judged at the time of the contract formation. *See Thunderstik Lodge, Inc.,* 2000 SD 84, ¶ 12, 613 N.W.2d at 47–48 (noting that the conduct complained of was not illegal as the parties sought to create an agreement to access lands for hunting, not to create an illegal agricultural lease).

[¶ 27.] Colleen argues that the prenuptial agreement is not severable because it does not meet the part performance requirements in *Thunderstik,* as the alimony provision and property provisions are too intertwined. Colleen contends that Denny attempted to contravene public policy by including the alimony waiver in the prenuptial agreement. Colleen also argues that Denny's serious misconduct during the marriage precludes severance of the prenuptial agreement by this Court.

[¶ 28.] In *Thunderstik,* the Court was asked to determine the validity of a lease agreement for hunting lands, a subject completely unrelated to prenuptial agreements. *See Thunderstik,* 2000 SD 84, ¶ 2, 613 N.W.2d at 44. As noted above, *Connolly* controls when the issue involves the severability of a prenuptial agreement that

---

5. In *Saxvik* we surveyed previous case law on the subject and concluded permanent alimony is modifiable. *See* SDCL 25–4–41. We also held that lump sum alimony, and restitutional or reimbursement alimony are not modifiable, nor is the denial of alimony. We left for another day the issue of whether rehabilitative alimony may be modified. However, we cautioned that "in dealing with the various types of alimony, it is not the label that is placed on the award that controls, but rather the nature of the award." *Saxvik,* 1996 SD 18, ¶ 16, 544 N.W.2d at 180 (citing *Hautala,* 417 N.W.2d 879).

includes a void attempt to waive spousal support rights, not *Thunderstik.*

[¶ 29.] Even if we were to apply general contract principles as we did in *Thunderstik,* the result does not change. Our holding in *Thunderstik* is based on the language of SDCL 53-5-4, which provides: "[w]here a contract has several distinct objects, one or more of which are lawful and one or more of which are unlawful in whole or in part, the contract is void as to the latter and valid as to the rest." Its application in that holding was based on Restatement (Second) Contracts § 183, which pertains to severability when "the parties' performances *can be* apportioned into corresponding pairs of part performance so that the parts of each pair are properly regarded as agreed equivalents[.]" (emphasis added). However, we have not had occasion to address the matter when performance *cannot* "be apportioned into corresponding agreed equivalents."

[¶ 30.] Other jurisdictions that have considered the matter of severability when the equivalent corresponding pairs requirement of Restatement (Second) Contracts § 183 cannot be met have looked to Restatement Second of Contracts § 184, which provides:

(1) If less than all of an agreement is unenforceable under the rule stated in § 178, a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the perform-ance as to which the agreement is unenforceable is not an essential part of the agreed exchange.

(2) A court may treat only part of a term as unenforceable under the rule stated in Subsection (1) if the party who seeks to enforce the term obtained it in good faith and in accordance with reasonable standards of fair dealing.

*See Huber v. Huber,* 323 Pa.Super. 530, 470 A.2d 1385 (1984).

[¶ 31.] In *Huber,* a postnuptial agreement for alimony and child support conditioned on the husband obtaining an uncontested divorce was held to be partially enforceable. *Huber,* 470 A.2d at 1390. In that case, a valid child support provision was not invalidated by the invalid portion of the agreement that encouraged divorce, although the invalid alimony provision was rendered unenforceable as it was against public policy. *Id.* at 1388.

[¶ 32.] In *Neilson v. Neilson,* 780 P.2d 1264, 1270 (Ut.Ct.App. 1989), valid property provisions in a prenuptial agreement were upheld despite the inclusion of an invalid property provision that encouraged divorce that was found to be against public policy.[6] That court noted that the provision that granted the wife a specified number of shares for each year of the marriage was valid and separable from the invalid provision that encouraged divorce, and provided a windfall of $400,000 for the wife if she was able to motivate the husband to divorce her. *Id.* at 1269. The rationale

---

**6.** The prenuptial agreement in *Neilson* provided that the husband would transfer a specified number of his total shares, which comprised his major retirement income asset, for each year of the marriage beginning with one-nineteenth in the first year and one-eleventh in the ninth year so that each spouse had the same number of shares at the end of the ninth year of marriage. *Neilson,* 780 P.2d at 1266. The agreement contained another provision in the event the parties divorced in an action initiated by the husband that would automatically entitle the wife to the number of shares that would provide her with an equal number of shares as the husband owned, regardless of the number of years the marriage survived. *Id.* That court held the end result of the clause was a $400,000 incentive for the wife to induce the husband to seek a divorce at the earliest possible date. *Id.* at 1269.

for the severability was based on Restatement (Second) Contracts § 184. *Id.* at 1270.

[¶ 33.] Our legislature last amended SDCL 53–5–4 in 1939, and in the face of our holding in *Connolly* on the severability of invalid portions of a prenuptial agreement from valid portion as handed down in 1978, it has not sought to amend SDCL 53–5–4 to exclude its application to prenuptial agreements. Therefore, we hold prenuptial agreements are severable under SDCL 53–5–4 if the agreement meets the requirements of Restatement (Second) Contracts § 183 as applied in *Thunderstik*, or if the agreement meets the requirements of Restatement (Second) Contracts § 184.

[¶ 34.] In the instant case, there is one single payment structure for both alimony and property rights. However, the alimony waiver is not an essential part of the agreed exchange. The language of the prenuptial makes it abundantly clear that Denny sought to protect his considerable property interests. The agreement contained a clause titled "Purpose," which read:

> Both parties desire that their marriage will not in any way change their legal rights or that of their children, heirs, beneficiaries and their property. Both parties therefore desire that the *property* of each be kept separate and that neither should acquire any actual or possible *interests in the property* of the other as a result of the marriage, except as provided in this Agreement. (emphasis added).

[¶ 35.] Noticeably absent from the stated purpose of the agreement is a reference to support and alimony. Support and alimony are mentioned only once, in one clause of the entire nine page agreement. Obviously the essential goal of the contract was to protect Denny's $55 million net worth.

[¶ 36.] Moreover, the language of the present prenuptial agreement itself addresses the issue of severability via a savings clause. Section 12 of the prenuptial agreement provides in relevant part: "[t]he invalidity or voidability of any part of this Agreement shall not affect the validity of the remaining parts." This savings clause clearly shows the parties intended the valid provisions to remain in effect even if voidable provisions were severed from the agreement. Colleen's reliance on our holding in *Thunderstik* also fails to consider that the contract in that case was materially distinguishable from the contract in the instant case, as the *Thunderstik* contract did not contain a severability clause.

[¶ 37.] Colleen contends that even if severability applies, Denny is precluded from benefiting from the doctrine due to his marital misconduct that includes at least one admitted affair. Misconduct as it pertains to the severability issue must occur at the contract formation stage. *See Thunderstik Lodge, Inc.*, 2000 SD 84, ¶ 12, 613 N.W.2d at 47–48. Misconduct after the contract is executed is not relevant to ascertaining the validity of the agreement at the formation stage. *Id.*

[¶ 38.] The trial court was correct in its legal analysis. Provisions in a prenuptial agreement purporting to limit or waive spousal support are void and unenforceable as they are contrary to public policy, and may be severed from valid portions of the prenuptial agreement without invalidating the entire agreement. In the instant case, the invalidity or unenforceability of the support provision in the Sanford prenuptial will not impede the enforceability of those portions of the prenuptial agreement that are found to be valid. Those provisions in the prenuptial that comport with our law on prenuptial agree-

ments are fully enforceable. In order to determine whether the property provisions are enforceable, we must examine whether the requirements of SDCL 25–2–21 were satisfied when the prenuptial agreement was signed by the parties.

**[¶ 39.] 2. Whether the circuit court erred when it concluded the property settlement portion of the prenuptial agreement was not unconscionable.**

[¶ 40.] SDCL 25–2–21 provides:

(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) That party did not execute the agreement voluntarily; or

(2) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

[¶ 41.] This Court has stated:

[A]n antenuptial agreement will be held valid if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the prospective spouse, or if the prospective spouse has been adequately provided for by the agreement. *Ryken v. Ryken,* 461 N.W.2d 122, 125 (S.D.1990) (*Ryken II*) (quoting *Ryken v. Ryken,* 440 N.W.2d 300, 304 (S.D.1989) (*Ryken I*) (citing *Schutterle v. Schutterle,* 260 N.W.2d 341, 348 (S.D.1977))).

[¶ 42.] We have had just two occasions to address what constitutes a "fair and reasonable disclosure" in the context of SDCL 25–2–21. In *Ryken II,* we held the burden of disclosure rests with each spouse, rather than placing an obligation on one spouse to determine the extent of the assets of the other spouse. 461 N.W.2d at 125. We noted that the husband in that case had an obligation to "disclose his assets to the best of his ability." *Id.* It does not fall upon a spouse to assume the role of detective in an attempt to ferret out the existence and value of the other spouse's assets. *Id.* It is sufficient "if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property." *Schutterle,* 260 N.W.2d at 348.

[¶ 43.] A majority of the jurisdictions that have reviewed the issue do not require the disclosure to be exact or precise. *See Darr v. Darr,* 950 S.W.2d 867, 870–71 (Mo.Ct.App.1997); *In re Marriage of Spiegel,* 553 N.W.2d 309, 317 (Iowa 1996); *In re Estate of Beesley,* 883 P.2d 1343, 1348 (Utah 1994); *Matuga v. Matuga,* 600 N.E.2d 138, 141 (Ind.Ct.App.1992); *Nanini v. Nanini,* 166 Ariz. 287, 802 P.2d 438, 441–42 (Ct.App. 1990); *In re Estate of Hartman,* 399 Pa.Super. 386, 582 A.2d 648, 651 (1990); *Pajak v. Pajak,* 182 W.Va. 28, 385 S.E.2d 384, 388 (1989); *In re Estate of Peterson,* 221 Neb. 792, 381 N.W.2d 109, 113–14 (1986); *Hengel v. Hengel,* 122 Wis.2d 737, 365 N.W.2d 16, 20 (Ct.App.

1985); *Jackson v. Seder*, 467 So.2d 422, 423 (Fla.Ct.App.1985); *In re Estate of Lopata*, 641 P.2d 952, 955 (Colo.1982); *Hook v. Hook*, 69 Ohio St.2d 234, 431 N.E.2d 667, 670 (1982); *Laird v. Laird*, 597 P.2d 463, 467 (Wyo.1979); *In re Marriage of Cohn*, 18 Wash.App. 502, 569 P.2d 79, 83 (1977); *In re Estate of Broadie*, 208 Kan. 621, 493 P.2d 289, 294 (1972); *Hartz v. Hartz*, 248 Md. 47, 234 A.2d 865, 870–71 (1967); *Simpson v. Simpson's Ex'rs*, 94 Ky. 586, 23 S.W. 361, 362 (Ct.App. 1893). A list of assets and liabilities with approximate values is considered sufficient in these jurisdictions to give the other spouse a reasonable or sufficient understanding of the other spouse's net worth. It must be accurate and specific enough to secure expert opinion as to valuation.

[¶ 44.] It is not necessary, given the language in SDCL 25–2–21, for a spouse to provide a detailed and exact valuation of his or her net worth in a prenuptial agreement. It is sufficient for a spouse to provide, within the best of his or her abilities, a list of assets and liabilities with approximate valuations. The listing must be sufficiently precise to give the other spouse a reasonable approximation of the magnitude of the other spouse's net worth.

[¶ 45.] In the instant case, Denny supplied Colleen with a detailed listing of assets and liabilities. According to Denny's deposition, his bookkeeper compiled the information using valuations from April 30, 1995. Denny's disclosure listed assets totaling $55 million dollars. Colleen was not able to identify any fault or issue with the financial statement that would indicate it failed to provide her with a reasonable approximation of Denny's net worth at the time the prenuptial agreement was executed.

[¶ 46.] Denny presented the financial disclosure to Colleen through her attorney on August 15, 1995. The parties signed the agreement on August 16, 1995, almost five weeks before the wedding that was scheduled for September 23, 1995. There was sufficient time between the date the document was presented to Colleen and the wedding date for Colleen to review the contents of the disclosure, obtain legal advice and decide whether to sign the agreement. Moreover, although she had advice of counsel, she signed the document prior to her marriage rather than ask for additional time to review and analyze the contents of the document. It cannot be said that there was any overreaching on the part of Denny with regard to the content of the financial disclosure, or the time and manner in which the prenuptial was presented, signed and executed.

[¶ 47.] Based on the foregoing, we conclude that Colleen is entitled to keep the property provided to her under the agreement. She gave up any future claim against Denny's property for it, and a fair reading of the record indicates there would have been no marriage without protection for Denny's property. We have concluded that this was the essential reason for the agreement and it is clearly severable from the single reference in the agreement to Colleen's waiver of alimony.

[¶ 48.] Affirmed.

[¶ 49.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.