# IN THE SUPREME COURT OF THE STATE OF DELAWARE

DAVID SILVERMAN,[1]

    Respondent Below,
    Appellant,

    v.

MICHELLE SILVERMAN,

    Petitioner Below,
    Appellee.

§
§   No. 188, 2018
§
§   Court Below—Family Court
§   of the State of Delaware
§
§   File No. CS15-01396
§   Petition No. 15-06696
§
§
§
§

Submitted: January 16, 2019
Decided: February 28, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Family Court of the State of Delaware: **REVERSED** and **REMANDED**.

David C. Gagne, Esquire (*argued*), and Achille C. Scache, Esquire, GIORDANO, DELCOLLO, WERB & GAGNE, LLC, Wilmington, Delaware, for Appellant, David Silverman.

Shawn Dougherty, Esquire, WEIK, NITSCHE & DOUGHERTY, LLC, Wilmington, Delaware, for Appellee, Michelle Silverman.

---

[1] The Court assigned pseudonyms to the parties under Supreme Court Rule 7(d).

**SEITZ**, Justice:

On February 19, 1997, David Silverman ("Husband") and Michelle Silverman ("Wife") signed a premarital agreement covering their financial affairs if they divorced or died. They married in 1997 and divorced in 2015. In the post-divorce property settlement, Husband sought to enforce the premarital agreement. The Family Court applied the statute governing premarital agreements and found that, although Wife voluntarily entered into the agreement, the disparity in wealth made the agreement unconscionable. Also, according to the Family Court, Husband failed to provide a fair and reasonable disclosure of his property or financial obligations before Wife signed the agreement. The court refused to enforce the agreement. We accepted Husband's interlocutory appeal from the Family Court's order.

Under the premarital agreement statute, unconscionability alone does not invalidate a premarital agreement. Wife also had to prove that Husband did not provide a fair and reasonable disclosure of his property or financial obligations. Because the Family Court erred when it found Husband's financial disclosure insufficient, we reverse and remand to the Family Court to enforce the premarital agreement.

## I.

Wife has a bachelor's degree in communications. Before Husband and Wife married in 1997, Wife was employed using her communications degree and lived

with her parents.  She planned to quit her job and move to Colorado.  Husband has an associate's degree and worked in his family's business.  A few months after they became romantically involved, in the spring of 1996 Wife moved in with Husband to live in Husband's apartment attached to his parents' home.

Husband and Wife planned a secret wedding in Las Vegas, Nevada.  About a month before the wedding Husband gave Wife a premarital agreement with terms favorable to Husband, who had more assets and income potential in the family business than Wife.  Under the agreement, each party waived alimony and agreed to retain separate "title, management, and control of the estates owned by them" and "all increases or additions thereto."[2]  They also agreed that upon death neither party would make a claim against the other or their estate "by inheritance, descent, dower, curtesy, or maintenance," including any claim to increases to the estates during their lifetimes.[3]  Further, any property that either party acquired after marriage would be "held by the respective party as though this respective party had acquired it before the solemnization of the said marriage."[4]

Husband suggested that Wife consult an attorney at his expense to review the agreement.  Wife retained an attorney from a list of attorneys provided by Husband.  Wife does not argue he was conflicted.  Wife's attorney explained the downsides to

---

[2] App. to Opening Br. at A400-07 (Premarital Agreement).
[3] *Id.*
[4] *Id.*

Wife of entering into the agreement and asked Husband's attorney for substantive changes to benefit Wife,[5] but Husband's attorney refused all changes except a provision relieving Wife of any debts incurred by Husband before or during the marriage.[6]

The day before the couple planned to leave for their Las Vegas wedding, Wife met with her attorney to review the agreement. The same day, before Wife met with her attorney, Husband gave Wife a summary of his assets and liabilities.[7] The record is unclear when Wife's attorney received Husband's disclosure, but the attorney had a copy when he met with Wife to review the agreement.[8] In the disclosure Husband and Wife summarized their assets and liabilities.[9] Wife's attorney advised her the agreement was not in her best interests and she should not sign it. Anticipating this

---

[5] *Id.* at A408-09 (Attorney Letter). In the letter to Husband's attorney and copied to Wife, Wife's attorney pointed out how the agreement disadvantaged Wife in the event of divorce or death because "the party's [sic] expect or otherwise intend for [Wife] to act as a 'homemaker', both she and any children of this union shall require significant financial security, as both of our client's [sic] have agreed that [Wife] will take herself out of the work force [sic] to assume her role as 'homemaker' and as a result, she has given up her job stability, accrued retirement benefits, and prospected for future advancement if she were to continue full-time employment." *Id.* Wife's attorney hoped that once he received Husband's financial disclosure, "it should not be difficult to arrive at a fair and equitable 'financial formula' to ensure [Wife]'s financial future…." *Id.*

[6] *Id.* at A415 (Attorney Letter) ("In regard to the substance of the Agreement, my client is not amenable to amending the document as drafted to provide the stated benefits to your client in the event of his death or termination of the marriage by divorce.").

[7] *Id.* at A44 (Hearing Tr., at 35).

[8] Husband's attorney may have sent the asset summary to Wife's Attorney a few days before. *See id.* at A413 (Attorney to Attorney letter listing assets).

[9] *Id.* at A406-07 (Summary of Assets and Liabilities).

4

day might come, her attorney also requested she sign an acknowledgement which provided as follows:

> I, [Wife], on this 19th day of February, 1997, hereby understand and acknowledge that I will be signing an Ante-Nuptial Agreement on this day, affecting statutory rights regarding alimony, property division, debt allocation, my elective share in my future husband's estate in the event of his death, as well as any other lawful right arising from my intended marriage to [Husband].

> I have sought the assistance of [Wife's Attorney] in explaining these rights and my waiver pursuant to the aforementioned Ante-Nuptial Agreement. I have been advised by [Wife's Attorney], that I will be waiving most of my statutory rights to property acquired during the marriage, any right to alimony, the right to have my Husband be responsible for any debt incurred in my sole and individual name during the marriage, as well as my statutory rights to my husband's estate in the event of his death.

> [Wife's Attorney] has advised me that this Ante-Nuptial Agreement is not in my best interests. After careful consideration of the Ante-Nuptial Agreement, I have no further questions, concerns, or revisions regarding said Agreement.[10]

Against her attorney's advice, Wife signed the premarital agreement and the acknowledgement on February 19, 1997.

The couple married on February 23, 1997 in Las Vegas without telling friends or family. According to Wife, the plan to keep the wedding a secret was Husband's, and Wife was "a little hesitant" to have a secret wedding.[11] Wife testified that Husband forbade Wife from discussing the marriage or the premarital agreement

---

[10] *Id.* at A424 (Signed "Understanding of Ante-Nuptial Agreement").
[11] *Id.* at A29 (Hearing Tr., at 20).

with anyone other than her attorney before the marriage.[12] Wife also testified that Husband had assured her the agreement was only a formality and that he would still take care of her either way.[13] Wife did not pursue significant employment during the marriage, devoting her time to the important task of raising their children and taking care of a large home and property.

## II.

In 2015, Wife petitioned for divorce. She asked the court to set aside the premarital agreement, and claimed she entered into the agreement involuntarily after being pressured by Husband. She also argued the agreement was so one-sided it was unconscionable, and her counsel did not competently represent her before signing the agreement. Finally, she claimed that Husband did not provide a fair and reasonable disclosure of his property or financial obligations before signing.

The Family Court found that Wife entered into the agreement voluntarily because she consulted with a lawyer before signing—who advised her not to sign— and she signed the acknowledgement confirming his advice.[14] For the same reason the court dismissed Wife's claim that counsel should have given her better advice before she signed the agreement.[15] But, the Family Court found the agreement so

---

[12] *Id.* at A40 (Hearing Tr., at 40).
[13] *Id.* at A48 (Hearing Tr., at 39).
[14] *[Silverman] v. [Silverman]*, No. CS15-01396, Pet. 14-06696, Order, at 6 (Del. Fam. Apr. 4, 2018) (hereinafter "Order").
[15] *Id.*

6

one-sided it was unconscionable based on the disparity in wealth between Husband and Wife.[16] It also found that Husband failed to adequately disclose his property or financial obligations because of errors and omissions in his financial disclosure involving a car, a life insurance policy, and how Husband described his ownership interest in about 200 acres of land.[17] Further, according to the Family Court, Wife did not have sufficient time to understand Husband's financial disclosure before signing the agreement.[18] Thus, the Family Court found the agreement unenforceable. Husband has appealed from the Family Court's interlocutory order invalidating the premarital agreement.

### III.

"When reviewing a Family Court order our standard and scope of review involves a review of the facts and law, as well as inferences and deductions made by the trial judge."[19] Questions of law are reviewed *de novo*.[20] Findings of fact are reviewed to assure that they are supported by the record and not clearly erroneous.[21] The unconscionability of the agreement is a question of law reviewed *de novo*.[22]

---

[16] *Id.*, at 11.
[17] *Id.*, at 12.
[18] *Id.*
[19] *Stewart v. Stewart*, 41 A.3d 401, 404 (Del. 2012).
[20] *Id.*
[21] *Id.*
[22] *Hughes v. Peterson*, 41 A.3d 395, 398 (Del. 2012); 13 *Del. C.* § 326 ("Any issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law").

What "fair and reasonable disclosure" of property and obligations requires is a question of statutory interpretation we review *de novo*.

A.

The parties have accepted the Family Court's ruling that Wife voluntarily entered into the premarital agreement. Thus, voluntariness is no longer at issue. Husband argues that the Family Court erred when it found the agreement unconscionable because the agreement's obligations were mutual, Wife had the advice of an independent attorney, and the Family Court failed to assess unconscionability at the time the parties signed the agreement. Husband also argues that the Family Court erred because any errors or omissions in Husband's financial disclosure were immaterial and did not mislead Wife in understanding the extent of Husband's wealth. Husband also argues in the alternative that Wife had sufficient knowledge of his property or financial obligations before marriage, and Wife waived the right to any disclosure according to the premarital agreement.

Wife responds that, although the statute requires the court to assess unconscionability at the time of execution, Husband already had substantially more assets at the time of execution and thus it was foreseeable that the imbalance would grow over time. Wife also argues that the Family Court correctly found that Husband's financial disclosure came too close in time to the execution of the agreement, had inaccuracies, and thus did not fairly and reasonably disclose

8

Husband's property and financial obligations. Finally, according to Wife, she was not fully aware of Husband's finances, and the premarital agreement did not provide for a waiver of her right to a fair and reasonable financial disclosure.

For the reasons explained below, under the premarital agreement statute, we need only address one issue to decide this appeal—whether Husband met the statutory standard for "fair and reasonable" disclosure of his property or financial obligations before signing the premarital agreement. After our review of the record, we find that Husband's financial disclosure met the statutory standard, and thus the Family Court should have enforced the premarital agreement.

## B.

Historically, the Court of Chancery resolved domestic relations disputes involving separate maintenance and premarital agreements.[23] By statute adopted in 1935, early premarital agreements could address the disposition of a married

---

[23] *See duPont v. duPont*, 85 A.2d 724, 733 (Del. 1951) (explaining how the Court of Chancery exercised its equitable powers to decide separate maintenance actions). For premarital agreements, it is likely that the Court of Chancery exercised jurisdiction based on its more general jurisdiction over estates. *See Tyre v. Lewis*, 276 A.2d 747, 748-49 (Del. Ch. 1971) (ruling a premarital agreement effective upon death enforceable on equitable grounds despite a statutory technicality); *Hill v. Hill*, 262 A.2d 661, 663 (Del. Ch.), *aff'd*, 269 A.2d 212 (Del. 1970) (finding a premarital agreement effective upon death valid); *Cochran v. McBeath*, 1 Del.Ch. 187 (1822) (enforcing a premarital agreement to protect a widow from her husband's creditors). *See also In Matter of Estate of Massello*, 1997 WL 89091, at *3 (Del. Ch. Feb. 24, 1997) (recognizing Court of Chancery jurisdiction in some situations to determine the validity of a contract when a husband died intestate). Until the Family Court's creation, the Superior Court had jurisdiction "of all actions for annulment of marriage, or for divorce." 2 Wooley on Delaware Practice Chapter XLIV § 1621 at 1099 (1906); *see also Del. C. 1935* § 3502.

couple's property during marriage and upon death, but not after divorce.[24]

Eventually, starting in the 1970's, courts recognized premarital agreements that

addressed property division following divorce.[25]

In Delaware, jurisdiction over separate maintenance and premarital

agreements eventually transitioned from the Court of Chancery to the Family

Court.[26] In 1990, the General Assembly enacted a statute conferring jurisdiction by

the Family Court over the "construction, reformation, enforcement and rescission of

agreements made between future spouses, spouses, and former spouses concerning

the payment of support or alimony" and "the division and distribution of marital

property and marital debts and any other matters incident to a marriage, separation

or divorce."[27] In 1996, the General Assembly enacted 13 *Del. C.* §§ 321-28,

modeled in substantial part after the Uniform Premarital Agreement Act ("UPAA"),

---

[24] *See Del. C. 1935*, § 3543 ("Ante-Nuptial Marriage Contracts:—A man and woman in contemplation of matrimony by a marriage contract executed in the presence of two witnesses at least ten days before the solemnization of the marriage, may determine what rights each shall have in the other's estate during marriage and after its dissolution by death, and may bar each other of all rights in their respective estates not so secured to them….").

[25] *See* J. Thomas Oldham, *With All My Worldly Goods I Thee Endow, or Maybe Not: A Reevaluation of the Uniform Premarital Agreement Act After Three Decades*, 19 Duke J. of Gender L. & Pol'y 83, 83 (2011) ("This novel idea [that prospective spouses could use a premarital agreement to alter the parties' respective rights and obligations if they divorce] was first announced in the U.S. in an opinion written by the Florida Supreme Court in 1970 [*Posner v. Posner*, 233 So.2d 381 (Fla. 1970)].") (hereinafter referred to as "*Oldham I*.").

[26] *See* 10 *Del. C.* § 902 (1971) (creating the statewide Family Court); 13 *Del. C.* § 507 (1974) (terminating Court of Chancery jurisdiction over support arrangements in favor of the Family Court); 13 *Del. C.* § 507 (1990) (granting the Family Court exclusive jurisdiction over premarital agreements).

[27] 13 *Del. C.* § 507(a) (1990).

drafted by the National Conference of Commissioners on Uniform State Law ("NCCUSL").[28]

Under the 1996 statute, a premarital agreement is "an agreement between prospective spouses made in contemplation of marriage, and which is effective upon marriage."[29] The agreement "must be in writing and signed by both parties." Further, "[i]t is enforceable without consideration."[30] The statute allows parties contemplating marriage to agree to a broad range of rights, including "the rights and obligations of each of the parties in any of the property of either or both of them,"[31] "the disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event,"[32] "the modification or elimination of spousal support or alimony"[33] and "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty."[34]

---

[28] Although Delaware adopted most of the UPAA, it did not adopt the Uniform Act's suggestion of a floor for spousal support if the spouse against whom enforcement is sought would require public assistance. *See* UPAA § 6(b) ("If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility").

[29] 13 *Del. C.* §§ 321, 324.

[30] *Id.* § 322.

[31] *Id.* § 323(a)(1).

[32] *Id.* § 323(a)(3).

[33] *Id.* § 323(a)(4).

[34] *Id.* § 323(a)(8).

At the heart of the statute is § 326, which addresses enforcement of premarital agreements:

> (a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
> > (1)    Such party did not execute the agreement voluntarily; or
> >
> > (2)    The Agreement was unconscionable when it was executed and, before execution of the agreement, that party:
> >
> > > a. Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
> > >
> > > b. Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
> > >
> > > c. Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Wife argues that, under the statute, the unconscionability and disclosure requirements should be read disjunctively. In other words, Wife claims she can prevail in this appeal if she demonstrates either unconscionability or financial disclosure problems. The plain language of the statute, however, is otherwise,[35] as is caselaw from other jurisdictions and scholarly commentary interpreting the

---

[35] When construing a statute, "and" is presumed to be conjunctive—especially when "or" is used in the same section disjunctively. *See Williams v. State*, 818 A.2d 906, 912 (Del. 2002) ("In its commonly accepted meaning 'and' is a connective, and is not generally used to express an alternative—unless it is followed by words which clearly indicate that intent.") (internal quotation marks omitted); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *7 (Del. Ch. Apr. 3, 2008) (noting that the statute used "or" elsewhere when reading "and" as connective).

UPAA.[36] Indeed, in a case decided just one year before Delaware's enactment of the UPAA, the Family Court recognized that the UPAA "does not intend that a lack of disclosure alone" provides a basis to invalidate a premarital agreement, and that overall, the UPAA "seem[s] less protective" than the approach exemplified by pre-UPAA cases that would allow for challenges based on unfairness alone.[37] Thus, to render the premarital agreement unenforceable under the statute, the spouse contesting enforcement must prove that the agreement is unconscionable *and* prove three other grounds—lack of fair and reasonable disclosure of the other spouse's

---

[36] *See*, *e.g.*, *Marscocci v. Marscocci*, 911 A.2d 690, 698 (R.I. 2006) ("[u]nconscionability alone …will not defeat a premarital agreement."); Elizabeth Carter, *Rethinking Premarital Agreements: A Collaborate Approach*, 46 N.M. L. Rev. 354, 371 (2016) ("The UPAA prohibits a finding of unconscionability if a party made adequate financial disclosure."); *Oldham I* at 85 (2011) ("an agreement that is unconscionable when signed is still enforceable if there was adequate disclosure of financial information, a waiver of the right to disclosure, or the party otherwise had access to such information."); Barbara Ann Atwood, *Ten Years Later: Lingering Concerns About the Uniform Premarital Agreement Act*, 19 J. Legis. 127, 128-29 (1993) ("[U]nconscionability alone, however, is insufficient under the Act to void an agreement; the party challenging the agreement must also show that he or she was not provided a reasonable disclosure"); Suzanne Reynolds, *Premarital Agreements*, 13 Campbell L. Rev. 343, 345 (1991) (interpreting North Carolina adoption of the UPAA which "make[s] an agreement enforceable even if it were unconscionable when executed as long as the moving party received a fair and reasonable disclosure *or* waived disclosure *or* reasonably could have had an adequate knowledge of the relevant information."). Some states, by contrast, have adopted a disjunctive approach—the one favored by Wife—in their versions of the UPAA by changing "and" to "or." *See* C.G.S.A. § 46b-36g (allowing for invalidation based on unconscionability "or" inadequate disclosure under the Connecticut statute); N.R.S. § 123A.080 (same under the Nevada statute). But judging by § 326's plain language, the General Assembly chose not to follow those states' lead, instead opting for the "less protective" approach. *James v. James*, 1995 WL 788187, at *11 (Del. Fam. Ct. May 18, 1995).

[37] *James*, 1995 WL 788187, at *11; *see also State ex rel. Price v. 0673 Acres of Land, More or Less, in Baltimore Hundred, Sussex Cty.*, 224 A.2d 924, 926 (Del. 1973) ("The General Assembly is presumed to have enacted legislation with knowledge of the existence and effect of prior law.").

property or financial obligations, non-waiver, and lack of adequate knowledge of Husband's property and financial obligations.

C.

Section 326(a)(2)(a) requires "fair and reasonable" disclosure of a spouse's property or financial obligations. What satisfies this standard will depend on the specific facts of each case. The financial disclosure must be "of a general and approximate nature, concerning the net worth of the other."[38] Absent fraud or overreaching, "the inadvertent failure to disclose an asset or the unintentional undervaluation of an asset will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings."[39]

The Family Court focused on three allegedly deficient aspects of Husband's disclosure: (1) failing to disclose ownership of a car, purchased in 1996 for

---

[38] *Matter of Estate of Thies*, 903 P.2d 186, 190 (Mont. 1995) (quoting *in re Estate of Hill*, 335 N.W.2d 750, 753 (Neb. 1983)). Some states have adopted a stricter "full and fair," or similar, standard whereby a more thorough and exact disclosure of assets, including income, is required. *See* N.J. Stat. § 37:2-38 (requiring "full and fair disclosure of earnings, property, and financial obligations"); *Cannon v. Cannon*, 865 A.2d 563, 576 (Md. 2005) (requiring "frank, full, and truthful disclosure"); Amberlyn Curry, *The Uniform Premarital Agreement Act and its Variations Throughout the States*, 23 J. Am. Acad. Matrim. L. 355, 362, 374 (2010) (discussing the changes made by New Jersey and California to require "full" disclosure).

[39] *Wilson v. Moore*, 929 S.W.2d 367, 371 (Tenn. Ct. App. 1996) (internal citations omitted); *see also Hutchins v. Hutchins*, 430 P.3d 502, 512 (Mont. 2018) (interpreting Nevada's adoption of the UPAA as requiring "a clear enough picture of the other's property to understand the magnitude of the other's assets and obligations" while contrasting it to the "full and fair" disclosure other jurisdictions require); *Friezo v. Friezo*, 914 A.2d 533, 550 (Conn. 2007) (requiring a "general approximation" of assets and liabilities for fair and reasonable disclosure); *Nanini v. Nanini*, 802 P.2d 438, 441 (Ariz. Ct. App. 1990) (not requiring the "exact dollar value" of assets to be shown).

$21,500,[40] which Wife drove but was titled in Husband's name; (2) omitting a $3000 life insurance policy; and (3) an inaccurate ownership description of a parcel of land—"50% interest in 200 acres – Milton $200,000.00."[41] We agree with Husband that the Family Court erred when it found these discrepancies sufficient to invalidate the agreement.

For the car, it is obvious that Wife knew about the car—because it was her car to drive—even if she was unsure of the title at the time of signing.[42] For Husband's life insurance policy, the $3000 represented an insignificant part of Husband's disclosure of $4,225,336 in net assets. Neither of these omissions was material to Wife's understanding of the extent of Husband's property and financial obligations. Finally, for the 200 acres of land, Husband admitted that he misdescribed his ownership interest as 50% instead of 100%. The error arose because he thought that his parents' life estates in the property impacted his ownership interest.[43] The ownership error, however, had no impact on Wife's understanding of Husband's property or financial obligations. On appeal, Wife has not challenged Husband's $200,000 property value estimate in his summary of assets and liabilities.[44] Whether

---

[40] App. to Opening Br. at A290 (Hearing Tr., at 170).
[41] *Id.* at A406 (Summary of Assets and Liabilities).
[42] In her testimony Wife described it as "a company vehicle." App. to Opening Br. at A52 (Hearing Tr., at 43).
[43] App. to Opening Br. at A311 (Hearing Tr., at 191).
[44] Wife notes that the property actually constituted 208 acres, which should have been valued at approximately $208,000. App. to Opening Br. at A363 (Hearing Tr., at 243).

Husband owned 50% or 100% of the property did not affect Husband's financial disclosure because 100% of the property value—$200,000—was included in the total value of Husband's assets. Because none of the errors were material to Wife's overall understanding of Husband's property or financial obligations, Husband met the statutory requirements.

Finally, Wife relies on the Family Court's finding that she was not given enough time to review Husband's financial disclosure. Although there may be circumstances when undue pressure to sign a premarital agreement might invalidate an agreement, that concern is not present here.[45] Wife also had an attorney to advise her, mitigating any timing unfairness. Her attorney advised Wife not to sign. Unfortunately, her decision to sign the agreement has now caused her financial hardship after many years of marriage and raising children. But, the premarital agreement statute, as presently in force, does not permit Wife to avoid the agreement.

---

[45] For instance, undue pressure might be exerted to sign a premarital agreement presented just before the wedding day when family and friends are invited, the reception is planned, and cancelling would cause embarrassment. *See In re Estate of Hollett*, 834 A.2d 348, 353 (N.H. 2003) (noting the "embarrassment of canceling a two hundred guest wedding" when analyzing the disparity in bargaining power between the parties). That concern is not present here because Husband and Wife planned a secret wedding in Las Vegas. *See In re Marriage of Bonds*, 5 P.3d 815, 820 (Cal. 2000) (finding that "[r]espondent's refusal to sign the Agreement would have caused little embarrassment to her. The wedding was a small impromptu affair that could have been easily postponed" when discussing voluntariness); *L.W. v. J.J.W.*, 2014 WL 4203848 (Del. Fam., June 27, 2014) (Wife had "ample opportunity to express her discomfort with signing the document prior to the ceremony without the potential embarrassment and cost of cancelling a large wedding.").

16

**IV.**

Under the premarital agreement statute, unconscionability alone does not invalidate an agreement. Wife also had to prove that Husband failed to provide a fair and reasonable disclosure of his property or financial obligations. The Family Court erred when it found Husband's financial disclosure deficient. Thus, the Family Court's April 4, 2018 decision is reversed, and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.[46]

---

[46] The version of the UPAA adopted by the General Assembly in 1996 has been the subject of much debate. *See* Barbara Atwood, *Marital Contracts and the Meaning of Marriage*, 54 Ariz. L. Rev. 11, 33 (2012) ("The UPAA has been the target of vigorous criticism, and half the adopting states have changed the black letter of the Act in their own jurisdictions. Variations in the adopting states include stronger procedural safeguards, broader substantive review of agreements, and increased protection for spousal support."). In 2012 the NCCUSL published the new Uniform Premarital and Marital Agreement Act (UPMAA). *See* J. Thomas Oldham, *Would Enactment of the Uniform Premarital and Marital Agreement Act in All Fifty States Change U.S. Law Regarding Premarital Agreements*, 46 Fam. L. Q. 367 (2012) (explaining the differences between the UPAA and the UPMAA). It might be time to take another look at Delaware's premarital agreement law in light of our State's experience with the UPAA and changes in domestic relations laws.